[Crim. No. 8250. In Bank. Sept. 17, 1965.]

THE PEOPLE, Plaintiff and Respondent, v. EARNEST LEROY JACOBSON, Defendant and Appellant.

Frank C. Morales, under appointment by the Supreme Court, for Defendant and Appellant.

Thomas C. Lynch, Attorney General, William E. James, Assistant Attorney General, and Gordon Ringer, Deputy Attorney General, for Plaintiff and Respondent.

MOSK, J.—A jury found defendant, Earnest LeRoy Jacobson, guilty of murder in the first degree, determined that he was sane at the time of the killing, and fixed the penalty at death. The trial court denied motions for new trial and for reduction of the penalty. The appeal is automatic. (Pen. Code, § 1239, subd. (b).)

Defendant lived in Signal Hill, Los Angeles County, with Mrs. Grace Babcock and her four children. The youngest child, Kelly, age 21 months, was the daughter of defendant and Mrs. Babcock. Mrs. Babcock supported defendant, who was unemployed, and all the children. She left for work at 7:30 a.m. on January 23, 1964, and shortly afterwards the three oldest children departed for school, leaving defendant at home to care for Kelly.

About 2:15 p.m. that afternoon, Martin J. Peterson, a social caseworker who had assisted Mrs. Babcock in obtaining support payments for her children, received a phone call from a man whose voice he recognized as defendant's. Defendant told Peterson he had just killed his child and asked Peterson to bring him $20 so he could buy cigarettes when the police took him to jail. Peterson told defendant he would come right over to the Babcock house and asked him to wait there. He then called the police.

Signal Hill Police Sergeant Arthur G. LeBlanc was the first person to arrive at the scene in response to Peterson's call. He was unable to gain entry to the Babcock residence and went next door where he found defendant sitting in the living room. LeBlanc observed that defendant's clothes were wet from chest to waist. He asked defendant what he had done, and the latter replied that he had done nothing. LeBlanc then said, "Let's go next door," whereupon defendant got up and began filling his pockets with candy and cigarettes. LeBlanc said, "You don't have to do that. You will be coming back," and defendant replied, "No, I won't. You are going to take me to jail." In response to LeBlanc's question as to why this was so, defendant answered, "I have not done anything, but you will see. But just remember this, I am not crazy. I am not drunk. I have had two beers. I knew

what I was doing when I did it, and I know what I am doing right now.''

LeBlanc, Jacobson, and Officer Kenneth Ryall then went to Mrs. Babcock's house. Upon entering the house defendant sat down in the living room and told LeBlanc he would ''find her in the bedroom where I put her.'' When LeBlanc asked, ''Who?'' defendant said, ''My daughter.'' He then volunteered that he had drowned her in the bathtub, that she had been asleep and ''didn't feel a thing,'' and that ''it was painless.''

LeBlanc dispatched two officers to the bedroom where they found Kelly lying face down on a bed, her body covered by a blanket. Drops or puddles of water were found on the bathroom floor, in the hallway leading from the bathroom to the bedroom, and on the top part of the bathtub. The tub was empty but appeared to be damp.

A fire department ambulance was called, and two attendants came to take the body to the hospital where Kelly was pronounced dead on arrival. The two ambulance attendants testified that while they were passing through the house they heard defendant tell Sergeant LeBlanc, ''I killed the little bastard.''

Defendant was then placed under arrest by LeBlanc and taken to the police station in a police car accompanied by Officer Ryall and the Signal Hill chief of police. Ryall testified that defendant continued to discuss the incident on the trip to the station, saying he was not drunk, he was glad she was dead because the child was nothing but a bastard, he wished it had been her mother, and he had picked up the sleeping child and put her in the tub.

Upon arriving at the police station defendant was placed in the ''booking cell'' where another officer, Donald J. Anderson, questioned him. Defendant continued to make statements similar to those made in the presence of LeBlanc and Ryall. An hour or two later LeBlanc arrived at the station after completing the investigation of the Babcock house. He interrogated defendant further, obtaining responses similar to those given earlier. During this questioning period defendant told LeBlanc that Kelly actually ''kicked up quite a fuss'' and splashed water on him. Sergeant LeBlanc and Officers Ryall and Anderson all testified to the statements made by defendant. The conversations which took place in the detention cell were tape-recorded, but the recordings were not introduced into evidence at the guilt phase of the trial.

Defendant testified on his own behalf at the trial. The version of the events he then recounted was similar to that he had earlier related on the day of his arrest. At trial, however, he claimed that after filling the tub, he had a period of "blackness" following which he discovered Kelly lying face down in the water.

After being properly instructed on the law and degrees of homicide, the jury returned a verdict of murder in the first degree. Defendant offered no evidence at the second-phase trial on his plea of not guilty by reason of insanity. The prosecution presented a court-appointed psychiatrist who had examined defendant. He testified that defendant, although suffering from chronic alcoholism, was legally sane at the time of the killing. The jury returned a verdict that defendant was legally sane.

At the penalty phase of the trial the prosecution offered the testimony of a taxi driver, William Corbett, who had previously signed a complaint against defendant charging him with assault with a deadly weapon. Corbett was permitted to testify despite the fact that the assault charge had been dismissed upon defendant's plea of guilty to second degree burglary, a lesser charge based on the same set of facts. Since Corbett's testimony would have been competent at a trial for assault with a deadly weapon, it was proper at the penalty trial here under the rules established in *People* v. *Terry* (1964) 61 Cal.2d 137 [37 Cal.Rptr. 605, 390 P.2d 381], and *People* v. *Purvis* (1961) 56 Cal.2d 93 [13 Cal.Rptr. 801, 362 P.2d 713].[1] At the conclusion of the penalty phase the court gave the approved *Morse* instruction (*People* v. *Morse* (1964) 60 Cal.2d 631 [36 Cal.Rptr. 201, 388 P.2d 33]), and the jury fixed the penalty at death.

Defendant raises three issues on appeal. First, he contends he was denied a fair trial because of the location of the trial and the conduct of the court. Secondly, he contends the prosecution presented insufficient evidence of the corpus delicti. Third, he contends that some of his statements were obtained

---

[1] A footnote in *People* v. *Terry* (1964) 61 Cal.2d 137, 149 [37 Cal. Rptr. 605, 390 P.2d 381], suggests that defendant should not be subject "to a finding of a jury that he committed prior crimes unless his commission of such prior crimes has been proven beyond a reasonable doubt." No instruction to that effect was requested or given here, but in the circumstances the failure to do so was immaterial. Defendant's conviction of the crime in question was charged in the information, and defendant admitted the truth of the allegation at the commencement of the trial. In addition, the conviction itself was based on a plea of guilty. Therefore defendant had in effect twice admitted his guilt of this crime, and an instruction on reasonable doubt would have been pointless.

in violation of his right to counsel and that their introduction into evidence requires reversal.

## Fairness of the Trial

■ Defendant contends he was denied a fair trial because of inflammatory news coverage of the crime. Morning and evening editions of the Long Beach newspaper had carried front page stories of the crime, featuring defendant's incriminating statements, and the front page of one edition contained a picture of defendant in a comical pose. It has been increasingly recognized that inflammatory news coverage of a crime, of the defendant's apprehension, and of the subsequent trial, can be a serious impediment to conducting proceedings fair to a defendant. As stated in the Report of the President's Commission on the Assassination of President Kennedy (1964) page 240: "Undoubtedly the public was interested in these disclosures, but its curiosity should not have been satisfied at the expense of the accused's right to a trial by an impartial jury. The courtroom, not the newspaper or television screen, is the appropriate forum in our system for the trial of a man accused of a crime." (See also *Estes* v. *Texas* (1965) 381 U.S. 532 [85 S.Ct. 1628, 14 L.Ed.2d 543]; *Rideau* v. *Louisiana* (1963) 373 U.S. 723 [83 S.Ct. 1417, 10 L.Ed.2d 663]; *People* v. *Martin* (1964) 19 App.Div.2d 804 [243 N.Y.S.2d 343]; *People* v. *Brommel* (1961) 56 Cal.2d 629 [15 Cal.Rptr. 909, 364 P.2d 845]; see *Sheppard* v. *Maxwell* (6th Cir. 1965) 346 F.2d 707, 738 [dissenting opinion]; 51 A.B.A.J. 534.) Nevertheless, it appears that the instant case falls short of requiring reversal on this ground. The court denied without prejudice defendant's motion for a change of venue pending an attempt to select a jury. Although the process of jury selection was lengthened as a result of the need to screen out persons who had been influenced by the press coverage, a panel was finally selected which included no one who could remember reading accounts of the crime or of defendant's arrest. Several veniremen stated they did not read the newspaper in question at any time. Defendant did not renew his motion for change of venue. It was possible to select an impartial jury, not because the coverage lacked inflammatory qualities, but because the circulation of the newspaper in question was limited. ■ As held in *State* v. *Truman* (1964) 124 Vt. 285 [204 A.2d 93, 96], "newspaper articles, even though denunciatory in character, are not in themselves in the absence of some evidence of the actual existence of a prejudice against the accused, sufficient

to require the judge, in the exercise of his discretion, to conclude that a fair and impartial trial cannot be had.''

■ Defendant additionally complains that the court did not properly exercise its responsibility of insuring that the jury remain impartial throughout the trial. He objects to the court obtaining from both counsel a stipulation that the usual admonition against discussing the case be given only at the commencement of the trial rather than at every recess. While this procedure may be, generally speaking, an inappropriate judicial shortcut in criminal cases, nevertheless we cannot say that as a result this defendant was denied a fair trial. Despite the stipulation, the court did repeat the admonition on several occasions, particularly prior to the longer recesses. A review of the entire record demonstrates that the jury was adequately warned it was not to discuss the case before ultimately retiring to deliberate.

■ Defendant also suggests the court compounded the untoward effect by its response to a juror's query whether it would be proper to read newspaper accounts of the trial. The court replied, ''It is a difficult thing to ask you, but would you please skip any newspaper accounts of this? I'm not asking you to not look at the newspaper, but if there is an account of this trial, it would be conducive to a fair trial if you would skip that and read the sport page or funnypaper or something else.'' If error exists in the foregoing statement it must be found in the manner in which the instruction was given, for in substance the court was correct. To reverse on the basis of the technique of instructing in this instance would be absurd. The casual approach could well have been more effective in obtaining the cooperation of the jurors than a more serious demeanor.

### The Corpus Delicti

■ Defendant next contends his extrajudicial statements were erroneously admitted before the People had adequately established the death of a human being and the existence of a criminal agency causing that death. ■ It is clear that before extrajudicial statements may be introduced the prosecution must show a prima facie case of the corpus delicti by proof aliunde. (*People* v. *Mehaffey* (1948) 32 Cal.2d 535, 544-545 [197 P.2d 12], and cases cited.) The corpus delicti may be proved inferentially. (*People* v. *Cullen* (1951) 37 Cal.2d 614, 624 [234 P.2d 1], and cases cited.)

■ In the case at bar the death of Kelly Babcock was undisputed, but proof of a criminal agency presented a more

difficult problem. The autopsy surgeon, a pathologist, testified that the death was caused by drowning, and that the child was otherwise normal and healthy and showed no signs of injury at the time of death. He concluded that under these circumstances a 21-month-old, 35-inch-tall child would not drown accidentally in a bathtub. He based this conclusion on his medical opinion that natural survival instincts would cause the child to eliminate any water she might have swallowed by coughing while at the same time elevating her head above the level of the water in order to breathe unless prevented from doing so by some external force.

Before ruling on whether a prima facie showing had been made, the court permitted defendant to present evidence out of order to support his contention that the drowning was accidental. He offered statistics showing that several accidental home drownings of children over 12 months old had occurred in Los Angeles County in the previous few years. He further introduced the testimony of a pediatrician to the effect that a child could drown accidentally in a shallow body of water through a process of swallowing water upon submersion, followed by panic causing the child to continue to swallow water rather than to elevate its head.

With two possible contrary inferences before it, the court did not err in ruling that a prima facie showing of corpus delicti had been made. To meet the foundational test the prosecution need not eliminate all inferences tending to show a noncriminal cause of death. Rather, the foundation may be laid by the introduction of evidence which creates a reasonable inference that the death could have been caused by a criminal agency (see *People* v. *Mehaffey* (1948) *supra,* 32 Cal.2d 535, 545), even in the presence of an equally plausible noncriminal explanation of the event. (See *People* v. *Andrews* (1963) 222 Cal.App.2d 242, 244 [35 Cal.Rptr. 118]; *People* v. *Waack* (1950) 100 Cal.App.2d 253, 254-255 [223 P.2d 486]; *People* v. *Gouldy* (1945) 69 Cal.App.2d 6 [158 P.2d 59].)

## Defendant's Statements

Finally defendant contends his conviction must be reversed because the introduction of certain of the incriminating statements made by him violated the rules established in *Escobedo* v. *Illinois* (1964) 378 U.S. 478 [84 S.Ct. 1758, 12 L.Ed.2d 977], and *People* v. *Dorado* (1965) 62 Cal.2d 338 [42 Cal.Rptr. 169, 398 P.2d 361]. Six witnesses testified to hearing defendant admit his guilt, but not all of this testi-

mony is questionable under the *Escobedo-Dorado* framework. Three of the witnesses were not police officers, nor were the statements they related made during a process of police interrogation.

The three remaining witnesses were police officers, but again not all the statements which they recounted were inadmissible under the foregoing authorities. First, defendant voluntarily told Sergeant LeBlanc that he killed his daughter and how he did it. This conversation took place shortly after the officer arrived at the scene of the crime in response to Social Worker Peterson's call and before Kelly's body had been discovered. It must be remembered, moreover, that Peterson had been notified by defendant acting entirely on his own volition. LeBlanc's questions were the justifiable type of routine inquiries designed to determine what actually happened, as a means of commencing an investigation. Particularly under these circumstances, the child not having yet been found, dead or alive, the privilege of the police at this clearly investigatory stage to ask relevant questions which might be necessary to save a life takes precedence over their duty to advise a suspect of his constitutional right to remain silent. (*People* v. *Modesto* (1965) 62 Cal.2d 436, 446 [42 Cal.Rptr. 417, 398 P.2d 753].)

Defendant continued to declare his guilt in the police car on the way to the station following his arrest. From the record it appears that these statements were not "elicited" during a process of interrogation, but rather were volunteered by defendant who, according to other testimony, tended to be voluble when he had been drinking. (Cf. *People* v. *Dorado* (1965) *supra*, 62 Cal.2d 338, 354, fn. 8.)

Finally we come to the statements made by defendant at the police station, the first to Officer Anderson while defendant was in the detention cell during the booking process and the second to Officer LeBlanc about two hours later. Upon analysis of the surrounding circumstances (*People* v. *Stewart* (1965) 62 Cal.2d 571, 579 [43 Cal.Rptr. 201, 400 P.2d 97]), it appears these two later statements were elicited after the investigation had focused upon defendant and during a process of interrogation which lent itself to obtaining incriminating admissions. (*Escobedo* v. *Illinois* (1964) *supra*, 378 U.S. 478; *People* v. *Dorado* (1965) *supra*, 62 Cal.2d 338.) Defendant had already admitted guilt in the presence of two police officers. He was now under arrest and detained at the police station while undergoing the booking process. The admissions were made during the course of interroga-

tions by police officers and were tape-recorded. The intent of the officers undoubtedly was to elicit further incriminating details and preserve his confessions for use at trial. Furthermore, when defendant ceased making incriminating statements and began to deny his guilt, the questioning ended and an attempt was made to reach an attorney to represent him. Thus defendant's right to counsel had arisen, and the remaining issues before us are whether he waived this right and whether the use of the inadmissible statements was prejudicial.

Defendant had a prior felony record and an extensive arrest record, but the record does not indicate that he was ever actually advised at an appropriate time of his right to remain silent or of his right to the assistance of counsel. Defendant could not have been aware of a right to counsel which did not arise until later by virtue of the chronology of legal literature. To presume, therefore, ''that absent the warnings defendant knew of his right to counsel at the prearraignment stage prior to the time that the United States Supreme Court established this right in *Escobedo* would be to ascribe to him an utterly fictitious clairvoyance.'' (*People* v. *Stewart* (1965) *supra*, 62 Cal.2d 571, 581.) In these circumstances no valid waiver of the right to counsel is shown.

We turn, therefore, to the question whether the introduction of the statements obtained in violation of defendant's right to the assistance of counsel was reversible error. In *People* v. *Dorado* (1965) *supra*, 62 Cal.2d 338, 356, this court held that ''the error is necessarily prejudicial when the statements are confessions.'' And in *People* v. *Schader* (1965) 62 Cal.2d 716, 728-729 [44 Cal.Rptr. 193, 401 P.2d 665], the majority emphasized that in considering the effect of confessions obtained in violation of the right to counsel the court will adhere to the rule, laid down in coerced confession cases, that introduction of such statements vitiates the judgment regardless of other evidence. Two reasons for that position have been advanced.

One view holds that when a confession is obtained by methods which violate constitutional rights, law enforcement officials must suffer the penalty of reversal if such a confession is used at trial. This harsh result, contend the advocates of this view, is the only means by which illegal police activity can be successfully checked. The United States Supreme Court has expressed this view in exercising its supervisory power over the administration of criminal justice in the fed-

eral courts. (See *McNabb* v. *United States* (1943) 318 U.S. 332 [63 S.Ct. 608, 87 L.Ed. 819].) ▋ In California, however, we have taken a somewhat different view, while recognizing the beneficial effect that results when police investigations are conducted within the constitutional framework. This court has been more concerned with the fairness of the trial, and we are of the opinion that "courts cannot inquire into the prejudicial nature of the introduction of an illegally obtained confession for the reasons stated in *People* v. *Parham* (1963) 60 Cal.2d 378, 385 [33 Cal.Rptr. 497, 384 P.2d 1001] : 'Almost invariably . . . a confession will constitute persuasive evidence of guilt, and it is therefore usually extremely difficult to determine what part it played in securing the conviction. [Citation omitted.] These considerations justify treating involuntary confessions as a class by themselves and refusing to inquire whether in rare cases their admission in evidence had no bearing on the result.' " (*People* v. *Dorado* (1965) *supra*, 62 Cal.2d 338, 356.)

▋ Nevertheless, on this record we do have a "rare case" in which a refusal to inquire into the impact, if any, of the confession on the verdict would result in complete abandonment of article VI, section 4½, of the California Constitution. Although the reports are replete with reversals for the use of improperly obtained confessions "regardless of other evidence," only one case seems to share the distinguishing factual feature here presented : i.e., a case in which the defendant confessed not once but a number of times and in which most of the statements were properly obtained. In *Stroble* v. *California* (1952) 343 U.S. 181 [72 S.Ct. 599, 96 L.Ed. 872], the defendant had confessed repeatedly and the confessions were used at trial. He contended on appeal that the first confession in this sequence was coerced. The conviction was affirmed because the high court found the challenged confession voluntary. In dictum, however, the court remarked that had that confession been involuntary a reversal would have followed despite the other confessions. In explaining this view the court noted that "the confession was a prominent feature of the trial." (*Id.* at p. 190.)

The same cannot be said in the case before us. No undue emphasis was placed on any of the confessions at the guilt phase.[2] Each person who had witnessed defendant make an

---

[2]At the penalty phase the prosecution played for the first time the tape recording of the statements made by defendant at the police station. The effect of this will be discussed *infra*.

incriminating statement testified to what he had heard. No one confession contained details significantly different from the others. The two improperly obtained statements were therefore merely cumulative. Moreover, the sequence of the confessions here, where the improper statements were the last obtained, can give rise to no implication that the legally obtained confessions were "induced" by those subsequently improperly obtained.

The jury's task was simply to determine whether defendant spoke the truth on the day Kelly Babcock died or on the witness stand. There were approximately 10 separate admissions or confessions made by defendant, the number subject to varied calculations, since some began moments after others terminated. It is not plausible, having reviewed this record, to conclude that 10 statements were sufficiently more persuasive than only eight and that the elimination of two would have altered the outcome. As stated in *Fahy* v. *Connecticut* (1963) 375 U.S. 85, 86 [84 S.Ct. 229, 11 L.Ed.2d 171], "the question is whether there is a reasonable possibility that the evidence complained of might have contributed to the conviction." Under these circumstances the answer must be unequivocally negative.

 At the penalty phase of the trifurcated trial the tape recording of defendant's statements made at the police station was played to the jury for the first time. Because of the uncertainty as to which factors may cause a jury to choose death rather than life for a defendant, and because the prosecution has a wider latitude as to the type of evidence it may introduce at a penalty trial, we will closely scrutinize any error committed therein and will reverse the penalty judgment if we find that error to have been "substantial." (*People* v. *Hines* (1964) 61 Cal.2d 164, 169 [37 Cal.Rptr. 622, 390 P.2d 398].) Thus the question here is whether the playing of the tape recording at the penalty trial for the first time was, of itself, "substantial error" within the meaning of *Hines*.

The apparent purpose of the prosecution in playing the recording was to allow the jury to hear the tone of defendant's voice as he told how he killed his daughter, and to draw the inference therefrom that he felt no remorse for the crime. This lack of remorse, however, had been amply demonstrated during the guilt phase through the testimony of the witnesses who had heard defendant's various statements. For example, Martin Peterson, the social worker, was asked to

describe defendant's tone of voice when he called requesting money for cigarettes. Peterson testified, ''I feel his voice was no different than in any prior conversations. . . . It was not subdued, it was not irrational, it was a normal voice.'' Sergeant LeBlanc also described defendant's conversations: ''He was merely speaking fast, but other than that there wasn't anything unusual.'' Mrs. Jean Butler, from whose home defendant telephoned Peterson, described his demeanor and tone of voice as follows:

''Q. Did he express any particular concern or feeling in terms of words at that time?

''A. No. . . . Well, he didn't act concerned about anything. He acted just calm, and the tone of his voice was like somebody was asking him a silly question and he was giving them a silly answer. . . .

''Q. So far as what you could hear on your end, was the conversation mostly about money?

''A. Yes. Well, then after he said he was going to jail he said he had killed someone dear to him.

''Q. And when he said that, how did he act?

''A. Calm, as if it were nothing.

''Q. Did he express any anxiety of any kind?

''A. No. . . .

''Q. When he talked about having killed somebody did you hear any inflection in his voice, did you hear any emotion in his voice at all?

''A. No.''

Here the jury considered all the evidence introduced at the earlier phases of the trial in reaching its penalty verdict, and therefore heard considerable testimony establishing that defendant felt no remorse for having killed his daughter. Playing the recording at the penalty phase of the trial was, at most, cumulative of this earlier and admissible testimony. Viewing the entire evidence, it appears that the playing of the recording did not constitute ''substantial error.''

Defendant has urged us to disapprove the suggested instruction to be given at the penalty trial proposed in *People v. Morse* (1964) 60 Cal.2d 631, 648 [36 Cal.Rptr. 201, 388 P.2d 33], and asks particularly that we disapprove any mention of the possibility of parole of a convict sentenced to life imprisonment. In *Morse* we considered that contention but rejected it, saying: ''To avoid such unanswered queries and to prevent latent misconceptions, we believe the trial court, at the time of rendition of all instructions, should inform the jury in general terms that life imprisonment can result in

parole but that such matters are of no concern to it.'' (*Id.* at p. 647.) Defendant suggests no reason why the *Morse* instruction has not proved satisfactory. There is no way to instruct the jury that it is not to consider the possibility of parole in its deliberations without candidly revealing that such a possibility exists. The value of the admonition outweighs any danger resulting from so informing the jury. Many jurors will know, as a matter of common knowledge, that under the parole system convicted murderers in some circumstances do become eligible for parole. Unless admonished by the court, the jury might consider this a subject for discussion during its deliberations on penalty.

After an examination of the entire cause, including the evidence, we are of the opinion that there is no reasonable possibility that the errors complained of might have contributed to the conviction. (Cal. Const., art. VI, § 4½; *People* v. *Watson* (1956) 46 Cal.2d 818, 836 [299 P.2d 243]; *Fahy* v. *Connecticut* (1963) 375 U.S. 85, 91 [84 S.Ct. 229, 11 L.Ed.2d 171].)

The judgment is affirmed.

Traynor, C. J., McComb, J., Tobriner, J., Peek, J., and Burke, J., concurred.

PETERS, J.—I dissent.

Admittedly at least two confessions were secured from defendant under circumstances violative of the rules set forth in *Escobedo* v. *Illinois*, 378 U.S. 478 [84 S.Ct. 1758, 12 L.Ed. 2d 977], and *People* v. *Dorado*, 62 Cal.2d 338 [42 Cal.Rptr. 169, 398 P.2d 361]. It is well settled by both California and federal law that the erroneous admission of a confession is prejudicial per se and requires a reversal. This problem was fully, carefully and correctly considered in *People* v. *Dorado*, *supra*, which decision until now has been consistently followed.

In *Dorado, supra*, at pages 356-357, we stated:

''Finally, we cannot dispose of the introduction of the illegally obtained confession upon the ground that it constituted merely harmless error. Although under some circumstances the introduction into evidence of statements obtained from a defendant during police interrogation in violation of his right to counsel and his right to remain silent may constitute harmless error, we are convinced that the error is necessarily prejudicial when the statements are confessions. Indeed, *Es-*

*cobedo* itself follows *Hamilton* v. *Alabama* (1961) 368 U.S. 52 [82 S.Ct. 157, 7 L.Ed.2d 114], and *White* v. *Maryland* (1963) 373 U.S. 59 [83 S.Ct. 1050, 10 L.Ed.2d 193], cases which do 'not rest . . . on a showing of prejudice.' (*White* v. *Maryland, supra,* at p. 60.)

''The use of an involuntary confession results in a denial of due process and requires reversal 'regardless of other evidence of guilt.' (*People* v. *Matteson* (1964) 61 Cal.2d 466, 469-470 [39 Cal.Rptr. 1, 393 P.2d 161]; accord: *People* v. *Brommel* (1961) 56 Cal.2d 629, 634 [15 Cal.Rptr. 909, 364 P.2d 845]; *People* v. *Trout* (1960) 54 Cal.2d 576, 585 [6 Cal.Rptr. 759, 354 P.2d 231, 80 A.L.R.2d 1418]; *People* v. *Berve* (1958) 51 Cal.2d 286, 290 [332 P.2d 97]; *Lynumn* v. *Illinois* (1963) 372 U.S. 528, 537 [83 S.Ct. 917, 9 L.Ed.2d 922]; *Rogers* v. *Richmond* (1961) 365 U.S. 534, 540-541 [81 S.Ct. 735, 5 L.Ed.2d 760]; *Payne* v. *Arkansas* (1958) 356 U.S. 560, 567-568 [78 S.Ct. 844, 2 L.Ed.2d 975].)

''The improper introduction of the confession which has been obtained in violation of the constitutional right to counsel transgresses the protection of due process no less than the illegal introduction of a confession which has been coerced. In either case courts cannot inquire into the prejudicial nature of the introduction of an illegally obtained confession for the reasons stated in *People* v. *Parham* (1963) 60 Cal.2d 378, 385 [33 Cal.Rptr. 497, 384 P.2d 1001]; 'Almost invariably . . . a confession will constitute persuasive evidence of guilt, and it is therefore usually extremely difficult to determine what part it played in securing the conviction. [Citation omitted.] These considerations justify treating involuntary confessions as a class by themselves and refusing to inquire whether in rare cases their admission in evidence had no bearing on the results.' Thus in the instant case the improper introduction of the confession obtained in violation of a constitutional right compels reversal.''

The United States Supreme Court cases cited above dealt with coerced confessions. As to them, the cases have established that a showing of prejudice is not required and that if improperly admitted a reversal is required regardless of the overwhelming evidence of guilt. In *Dorado* (*supra,* 62 Cal.2d 338, 356) as the above quote demonstrates, the coerced confession rule is applied to confessions admitted in violation of the constitutional right to counsel and the right to remain silent. Now what the majority have done is to create an exception to the rule of reversible per se that in fact emasculates that rule. They state that in multiple confession cases

article VI, section 4½, of the California Constitution is applicable, and that the error is not reversible unless prejudicial. This is simply to adopt the views of the dissenting justices in the *Dorado* case, *supra*. If we are going to reverse this basic holding of *Dorado* we should do so fairly and frankly, and after a full discussion of the problem. We should not do so by creating exceptions to a rule that has no exceptions.

If the problem of multiple confessions were an open one there might be some merit in the position taken by the dissenters in *Dorado, supra,* and by the majority in the instant case. But the question is not an open one. The United States Supreme Court has spoken, and its determination as to the effect of a violation of a federal constitutional right is binding on us. The United States Supreme Court has not only held generally that there are no exceptions to the rule that erroneous admission of a confession is reversible per se, but on at least two occasions has held specifically that the reversible error per se is applicable in multiple confession cases. The majority concede that *Stroble* v. *California,* 343 U.S. 181 [72 S.Ct. 599, 96 L.Ed. 872], held that if there was one coerced confession introduced into evidence, it required reversal in spite of the fact there were several ''good'' confessions. The ''multiple confession'' exception created by the majority in the instant case was directly repudiated in *Stroble*. It held that this court had been in error in holding that the admission of a coerced confession did not result in prejudicial error. It would appear that the majority in the instant case are attempting to reinstate the very rule that was repudiated in *Stroble*. The majority seek to distinguish *Stroble* on the ground that what was said in that case was dicta, and therefore not binding on us. It may be that what was said in *Stroble* was dicta, but it was dicta based on a prior decision—*Malinski* v. *New York,* 324 U.S. 401 [65 S.Ct. 781, 89 L.Ed. 1029]—a case cited and relied on in *Stroble*. The factual situation in *Malinski* is very similar to that in the instant one.

In *Malinski,* a conviction of murder had been based upon testimony of the defendant's multiple confessions. Two of the confessions were made to relatives and a third was made to a close friend. The latter confession contained a complete account of both the planning and the execution of the crime. In addition, the police had secured several confessions from the defendant and all but the first of these confessions were

introduced into evidence. The defendant contended that the first confession obtained by the police, the one which had not been introduced into evidence, had been obtained by coercion. The United States Supreme Court agreed. The court then went on to hold that although the first confession had not been introduced into evidence, its existence had been alluded to by both the prosecution and the judge. Solely by virtue of the references to the confession the court concluded:

"It is thus apparent that the judgment before us rests in part on a confession obtained as a result of coercion. Accordingly a majority of the Court do not come to the question whether the subsequent confessions were free from the infirmities of the first one." (*Id.*, 324 U.S. at p. 410.)

Thus, in *Malinski*, the court held that mere reference to a nonintroduced coerced confession by the prosecutor and trial court was sufficient to require a reversal of the cause no matter how many "good" confessions there were. The court in *Malinski* did not think it necessary to consider what part the confession played in the trial, and what was its evidentiary impact. It was sufficient for the United States Supreme Court that a coerced confession had been brought to the jury's attention. As already noted, this holding was the basis of *Stroble* and that case must be viewed as stating a similar rule. Thus, by force of these cases we are compelled to reverse all judgments where a confession, obtained in violation of the defendant's constitutional rights, is brought before the jury. This should be the end of this case.

But even if the majority were correct on this point, which they are not, they have fallen into another and very basic error. There were multiple confessions in this case. Some were clearly investigatory, and two were clearly accusatory and violative of *Escobedo*. The other confessions, at least as to several of them, occurred under circumstances that, dependent on the facts, they could be either accusatory or investigatory. But the court never passed on this issue. Because this case was tried before *Escobedo* neither the defense nor the prosecution was alerted to the importance of this issue. Thus the record is most incomplete. The majority, based on the incomplete record before us, determined as a matter of law that these confessions were secured under circumstances not violative of *Escobedo*. Thus, this court places itself in the place of the trial judge. I had always thought it to be the law that the defendant had a right, a constitutional right, to a decision by the fact finder of all factual issues in the case.

But now we find that in situations that are debatable the majority of this court have held that this court can determine whether or not a confession has been secured in violation of the rules announced in *Escobedo* v. *Illinois, supra.* This is in direct violation of *Jackson* v. *Denno,* 378 U.S. 368 [84 S.Ct. 1774, 12 L.Ed.2d 908, 1 A.L.R.3d 1205], held to be applicable to the *Escobedo-Dorado* problem by *People* v. *Schader,* 62 Cal.2d 716, 727 [44 Cal.Rptr. 193, 401 P.2d 665].

As to those "confessions" overheard by and testified to by third persons we can assume, as a matter of law, that these were not secured in violation of the rule announced in *Escobedo* v. *Illinois, supra,* 378 U.S. 478, and *People* v. *Dorado, supra,* 62 Cal.2d 338. But as to the remaining confessions the problem is a very close one. The majority conclude that two of these, as a matter of law, were introduced improperly, and I agree, but then the majority rule that the other confessions, as a matter of law, were properly introduced. This conclusion is palpably unsound.

As already pointed out, the majority, in order to rationalize their conclusion, found it necessary to hold that some of the confessions were properly introduced while others should have been excluded. The important confessions were those that the majority found, as a matter of law, had been made during the investigatory phase of the proceedings. It was only because the majority were able to find these to be "good" confessions that they were able, by specious reasoning, to affirm the judgment in spite of the "bad" confessions. This is an abuse of the appellate function. The defendant has a right to have factual issues determined on a proper record and by a proper factfinding body and to have a proper review of the legal issues involved in or raised by those findings.

In *Jackson* v. *Denno, supra,* 378 U.S. 368, the United States Supreme Court commented as follows upon the respective roles of the appellate and trial courts in confession cases: "Where pure factual considerations are an important ingredient, which is true in the usual case, appellate review in this Court is, as a practical matter, an inadequate substitute for a full and reliable determination of the voluntariness issue in the trial court and the trial court's determination, *pro tanto,* takes on an increasing finality. The procedures used in the trial court to arrive at its conclusions on the coercion issue progressively take on added significance as the actual measure of the protection afforded a defendant under

the Due Process Clause of the Fourteenth Amendment against the use of involuntary confessions. These procedures must, therefore, be fully adequate to insure a reliable and clear-cut determination of the voluntariness of the confession, including the resolution of disputed facts upon which the voluntariness issue may depend." (*Id.* at pp. 390-391.) That reasoning is applicable to the instant case. There is no legal difference between the fact of whether a confession was coerced and the fact of whether it was elicited by a process of interrogation. Here the trial court employed no procedures to insure that confessions that might run afoul of the standards of *Escobedo* and *Dorado* were eliminated. The trial court did not employ any such procedure because the case was tried before those decisions were rendered. Lacking trial court determinations on these issues, the majority have decided to make their *own* independent determinations of fact. Having assumed a factfinding function, the majority were then forced to rely upon a one-sided incomplete record, a record which was ill prepared to answer the questions involved. The majority were thereby forced to conclude on this issue, solely in accordance with the testimony adduced by the prosecution. Defendant's counsel did not cross-examine on this issue, because he did not know it was involved. This was tantamount to directing a verdict, on this issue, against the defendant, and this, of course, cannot be done. (*People* v. *Crowley,* 101 Cal.App.2d 71, 75 [224 P.2d 748] ; *People* v. *Conboy,* 15 Cal. App. 97 [113 P. 703]. Cf. *United Brotherhood of Carpenters & Joiners* v. *United States,* 330 U.S. 395, 408 [67 S.Ct. 775, 91 L.Ed. 673].)

Because this case, like several which have preceded it and some that will follow it, was tried prior to the *Escobedo* and *Dorado* decisions the records before this court were and are generally inadequate to answer the questions posed by the newly formulated rule. The defense could not have been expected to perfect a record on appeal upon a rule not yet formulated, and the manifest unfairness in so requiring has been previously recognized by this court when we held that no objection based upon the *Escobedo-Dorado* rule need be made to the introduction of confessions at the trials held before these decisions. (*People* v. *Hillery,* 62 Cal.2d 692, 711 [44 Cal.Rptr. 30, 401 P.2d 382].) This case indicates that it would be unfair to expect a defendant to perfect a record on an issue then unknown to him. Here the majority have abandoned the policy of *Hillery.* Here the majority have deprived the defendant of the opportunity to cross-examine the prose-

cution's witnesses on this issue, to impeach these witnesses as to this issue or to adduce further evidence on this issue. Of course, no instructions were given on this issue.

The proposed holding that an appellate court cannot decide against the defendant on the *Escobedo-Dorado* issues in doubtful cases is not a departure from our previous practice. Whenever we have held that the accusatory stage was reached and that the defendant had not been advised of his rights and therefore reversed the judgment, the cause has been reversed and remanded to the trial court. Presumably these cases will be tried anew and presumably at this new trial the prosecution could introduce additional evidence to establish that the defendant's *Escobedo-Dorado* rights were not violated. The defense will have an opportunity to meet and develop the issue. Those cases in which we have affirmed the judgment even though there was a violation of *Escobedo* by the introduction of statements, we admitted the error, but held it not prejudicial. That is, under our miscarriage of justice rule there was no need for a retrial. But in the instant case, the majority hold as a matter of law there was no error. This was necessary because, were the confessions made to the police held to be nonadmissible, a reversal would occur. This distinguishes this case from those already decided.

The transcript demonstrates the inadequacy of the evidence on this issue. Considering only the confessions made to the police officers, the record is hopelessly ambiguous. As to several of these confessions it cannot be ascertained with any certainty whether they were at the accusatory or investigatory stage. This is hardly surprising inasmuch as the testimony upon which the majority rely was only introduced for the purpose of demonstrating that the confessions were not coerced. No one knew or thought that the stage of the proceedings might be important.

Considering the confessions in the order in which they were made, the first full confession was given to Officer Le-Blanc. The majority approve of the introduction of this confession on two theories. First, they assert that the confession was not given in response to a process of interrogation and second, it was properly admitted under the rule announced in *People* v. *Modesto,* 62 Cal.2d 436, 446 [42 Cal.Rptr. 417, 398 P.2d 753].

Whether or not the confession was elicited by a process of interrogation requires an appraisal of all of the relevant circumstances. (*People* v. *Stewart,* 62 Cal.2d 571, 579 [43 Cal.

Rptr. 201, 400 P.2d 97].) The majority opinion discloses that several questions had been previously asked of the defendant prior to his making the confession. Whether the confession was given in response to these questions and whether these questions amounted to a process of interrogation are queries that must be answered by the fact finder. Certainly it is not so clear that the accusatory stage had not been reached that we should be willing to hold that it would be unreasonable to believe that a fact finder could so conclude or that the defendant, if he knew the issue were involved, could not have introduced relevant evidence on the issue.

The majority are also incorrect in their discussion of the applicability of the *Modesto* rule in connection with the interrogation by Officer LeBlanc. The majority hold that there was a paramount interest in possibly saving the child's life, but a reading of the transcript reveals no such intent on the part of the officer and no such emergency as was presented in *Modesto*. In that case the police had good reason to believe that the continued interrogation of the suspect might save the girl's life. There is no such showing in the present case.[1]

The last confession found by the majority to be admissible was given during the ride back to the station. This is a most flagrant example of an attempt by the majority to make a finding of fact on an incomplete transcript. The only possible clue as to whether there was a ''process'' of interrogation (all of the other requirements for the application of the *Escobedo-Dorado* rule were clearly met), was the officer's testimony that he had a ''conversation'' with the defendant on the way back to the station. Upon this the majority predicate their conclusion that there was no ''process'' but rather that the defendant's statement was volunteered by him. Precisely what the word ''conversation'' may mean is difficult to ascertain, but it is not without the realm of possibility that it means something other than that the statement was volunteered.

---

[1]Perhaps the majority are holding that so long as the victim has not been found there is, as a matter of law, a paramount interest in attempting to save the victim's life. There is no basis for such a broad reading of the *Modesto* holding. The paramount interest ought to be, in an appropriate case, one of the factual determinations made as part of the foundation to the introduction of a confession. There appears to be no good reason to formulate a rule that, as a matter of law, any time the police have not yet found the victim's body the police may interrogate the suspect, and certainly not in a case where they had been told the victim was dead.

The only complete confessions of first degree murder were made to, and related by, police officers. In all such situations as disclosed by the incomplete record, the fact finder might have ruled against the prosecution on the issue of the admissibility, had it been submitted to it. Certainly, if the parties had known the issue were involved, more evidence would and could have been introduced on it. It cannot be said that it is inconceivable that the taking of additional testimony would add nothing. On the contrary, from the state of the record before us it appears most desirable to have additional evidence to aid in the application of the *Escobedo-Dorado* standard to the confessions.

In this connection, we should not overlook the ruling of *Townsend* v. *Sain,* 372 U.S. 293 [83 S.Ct. 745, 9 L.Ed.2d 770]. In that case the United States Supreme Court was faced with the question of under what circumstances a federal district court upon a petition for writ of habeas corpus was required to hold a hearing and take additional evidence. The court concluded with the following test: "Where the facts are in dispute, the federal court in habeas corpus must hold an evidentiary hearing if the habeas applicant did not receive a full and fair evidentiary hearing in a state court, either at the time of the trial or in a collateral proceeding. In other words, a federal evidentiary hearing is required unless the state-court trier of fact has after a full hearing reliably found the relevant facts." (*Id.* at pp. 312-313.)

While it is true we are not compelled by the rule of *Townsend* to modify our state procedures to conform to the federal standard, "We recognize, however, the desirability of the maximum integration of such process in order to avoid the possibility of wasteful duplication." (*In re Shipp,* 62 Cal. 2d 547, 554 [43 Cal.Rptr. 3, 399 P.2d 571].)

There is still another error in the majority opinion that must be mentioned. Even were we to concede that the improperly admitted confessions were not prejudicial on the guilt trial (a concession I cannot make) their admission on the penalty trial would be demonstrably prejudicial error. The confessions admitted by the majority to have been secured in violation of *Escobedo-Dorado* were testified to, on the guilt trial, by the officers involved. On the penalty trial these confessions were proved by tape recordings, and the prosecuting attorney was permitted to argue not only the content of such confessions but that the tone of voice in which they had been delivered demonstrated a lack of re-

morse and an abandoned heart.[2] To say that this error was not "substantial" within the meaning of *People* v. *Hines*, 61 Cal.2d 164, 169 [37 Cal.Rptr. 622, 390 P.2d 398], is to close one's eyes to the realities of the situation. To permit the prosecutor to play the tapes in the presence of the jury and to permit him to argue that by the very tone of voice of the defendant he had demonstrated that defendant was a cold-blooded killer without remorse and should, therefore, suffer the death penalty, could not help but sway the jury away from any possibility of life imprisonment. It must be remembered that the jury determines life or death in its discretion, and certainly one of the things that it can and should consider in making this critical determination is the character of the defendant and whether or not he is a coldblooded killer lacking any remorse. Particularly is this true under the federal standard of reversible error, adopted by the majority in the instant case. As stated by the majority the test is whether there is a "reasonable *possibility* that the errors complained of might have contributed to the conviction." (Italics added.) That is, of course, the test adopted by the United States Supreme Court in *Fahy* v. *Connecticut*, 375 U.S. 85, 91 [84 S.Ct. 229, 11 L.Ed.2d 171], and is the proper test. Tested by that standard, or by the standard set forth in *People* v. *Watson*, 46 Cal.2d 818, 836 [299 P.2d 243], the errors here involved were incontrovertibly prejudicial, at least on the penalty trial. The fact that there is some other evidence to the effect that defendant acted without remorse is immaterial. That evidence, from the lips of third persons, is trifling when compared with the impact of hearing the defendant's own voice demonstrating that he was without remorse. The impact of the tape recordings cannot be calculated.

I would reverse the judgment in its entirety.

Appellant's petition for a rehearing was denied October 13, 1965. Peters, J., was of the opinion that the petition should be granted.

---

[2]Among other things the prosecutor argued to the jury that:
"I talked a few minutes ago about the lack of remorse. You don't need to go any further than just the testimony or just the hearing of the tape recording that you heard this morning as to his attitude. Even were the story that he told on this witness stand true—but you, of course, found it isn't—even assuming it true, that he just walked in there and discovered the child, no one but a cruel and callous man or a man incapable of belief could have acted and conducted himself as the tape shows he did."