16

[Crim. No. 9448. Second Dist., Div. Three. Nov. 3, 1965.]

THE PEOPLE, Plaintiff and Respondent, v. EDGAR ADAM TAGLE, Defendant and Appellant.

Morris Lavine, under appointment by the District Court of Appeal, for Defendant and Appellant.

Thomas C. Lynch, Attorney General, William E. James, Assistant Attorney General, and George J. Roth, Deputy Attorney General, for Plaintiff and Respondent.

SHINN, P. J.—In a trial without a jury Edgar Adam Tagle was convicted of the murder of Paul Chavez, the crime being determined to be of the first degree; he was sentenced to life imprisonment and appeals from the judgment. He was tried jointly with Jerry Nila, who was convicted of aiding Tagle to escape, in violation of section 32 of the Penal Code, was granted probation and has not appealed.

In his opening brief appellant contended that if the evidence was sufficient to support a conviction it proved that the crime was murder of the second degree or manslaughter, rather than murder of the first degree.

The appeal was briefed before the decision of *People* v. *Dorado*, 62 Cal.2d 338 [42 Cal.Rptr. 169, 398 P.2d 361]. After that decision came down we vacated the submission and called for briefs as to the applicability of the rules therein announced; supplemental briefs have been filed. We discuss first the contention made in those briefs.

There was evidence that appellant and Nila spent the evening of August 17, 1962, driving around in a car operated by Nila. During the course of the evening they made several stops and drank several glasses of beer. They stopped at a bar and a Negro woman joined them. It was disclosed that Nila had a pistol in the car. Late at night Tagle, Nila and the woman arrived at Dandy's Bar, the scene of the killing. They were drinking beer, listening to music and dancing. Shortly after their arrival Paul Chavez and two companions came into the bar. There were about ten persons in the bar. During the course of the evening Chavez danced with the woman who had joined Tagle and Nila and there were some good-natured words exchanged over this between Chavez and Tagle, but nothing to indicate any ill feeling.

Mrs. Bejarano, proprietor of the bar, testified she saw Tagle leave the barroom. Chavez's friends had left the room about five minutes earlier; Chavez was leaving the bar and was facing the door; Tagle who had been outside about 10 minutes came in; he said nothing to Chavez and Chavez made no movement toward him; Tagle, who was about 8 feet from Chavez fired two shots; as he and Nila were leaving, gun in hand, Tagle said ''something like if someone wanted more.'' Chavez had had two beers; he was not drunk; appellant had had four beers.

Gabino Gomez testified that as he came into the room from the outside he saw Tagle shoot Chavez; he heard no argument or any conversation between Tagle and Chavez.

Nila was arrested and went with the police to a vacant lot where he recovered the gun, which he had hidden. He was questioned by the police August 21st at 10:10 a.m. and made a statement in which he said that Tagle had asked him for the gun that was in the car, stated he only wished to scare Chavez with it, had taken the gun from the car, entered the bar; Chavez was leaving the bar. Tagle said: " 'Whose girl?' " ". . . and he shot at the floor. Then he shot Chavez and Chavez sunk slowly to the floor."

Tagle was arrested at 11:30 p.m. August 20; he was questioned by Officer Terry and told him he had not been at the bar; he was home and had talked to his girl friend, Mary Martinez, on the phone and talked with her until 1:15 a.m. August 17th, the night of the shooting. Terry interviewed Tagle again about 3:30 p.m. August 21st. Terry told Tagle he had conversed with Mary Martinez and she had told him that Tagle had not called her on the night of August 17th. He also told Tagle that Nila had told him about the shooting. Tagle then voluntarily gave a statement which was written down by Terry and signed by Tagle. It was received in evidence and read as follows: "This is a statement of Tagle, Edward Adam. I met my brother Roland when Jerry and I went to the bar at Pico and Albany at about 8:00 p.m. last Thursday night. My brother and Jerry had a couple of beers and we left with a girl that Jerry picked up in the bar. We let Roland out at his house at 11th Place and Blaine. Then the three of us went to the bar at Seventh and Central. We all three had a beer and I put 25 cents in the music machine, but before I pushed the button the other guy pushed the button on the music that he wanted to play. I said 'What is wrong with you? Don't you have any money?' And he just laughed. I grabbed—He just laughed and grabbed the girl that had gone to the bar with Jerry and I and started dancing with her. After the dance he came over and says, 'I know it's your girl friend but it doesn't make any difference, does it?' I told him—I told Jerry about it and he said that it was okay, that he had his gun out in the car and if they say anything he would go out—He would go and get it and scare him with it. Later the same guy (Chavez)—bumped into me as I was going over to play another record. I just looked at him and I told Jerry 'This guy is too much and is getting on my nerves.' Jerry told me that the gun was in the car and told me to go and get it and keep it with me. I went to the car that was parked in front of the bar and got the gun that

was under the driver's seat. The gun was chrome plated automatic I think because it was shiny. I don't know what caliber it was. I put it in my coat and went back in and sat down at the bar. I told Jerry that I had it with me. He told me to hold onto it and if the guy says anything to scare him with it. The other guy (Chavez) just across from me staring at me. He kept saying the girl was my girl friend two or three times and I told him it was not. He then said 'C-h-a-v-a-l-o,' a new word 'C-a-g-a-d-o,' meaning 'a little boy that has dirtied his pants.' I pulled out the gun and showed it to him and he asked if it was a toy. I told him 'No.' And he laughed and came closer to me. I pulled the trigger and the gun just seemed to pop but nothing happened. I pulled the trigger again and the guy (Chavez) just backed up and fell backwards. I did not see any blood. I thought he was joking and I didn't know he was hurt. I told Jerry 'Let's go.' And we left the bar. I climbed through the right front window of the car because the right front door wouldn't open. We drove south on Central and went to the right. We drove to the area of 20th and Trinity or Wall, and Jerry took the gun and went out of sight with it. Jerry said he would take it to his aunt's house. He returned in about 10 minutes and we went to Roland's house, then Jerry took me home. Jerry and I told Roland all about what had happened. The car was about a 1950 Ford or Mercury, two-door, and is dark green in color. I don't know who it belongs to but Jerry has been driving it for about two weeks. (Signed) 'Edgar Adam Tagle.' "
Officer Terry testified that he made no mention of a knife.

 Tagle gave no explanation of what his purpose was in getting the gun, except that Nila had told him to get it and "if the guy says anything to scare him with it." His statement implied that when Chavez called him a name he merely showed him the gun to frighten him. He did not pull the trigger until Chavez laughed and came closer to him. The first time he pulled the trigger "the gun just seemed to pop but nothing happened." He did not admit realizing the gun was loaded when he pulled the trigger the second time, and said that even then he did not realize Chavez had been hurt.

The statement was not a confession of an intention to shoot Chavez. It was only Tagle's admission that he fired the shots. In *People* v. *Fowler,* 178 Cal. 657, 664 [174 P. 892], the court said: "A confession, in criminal law, is an admission or statement, by a person accused of crime, to the effect that he

is guilty thereof;" and also said, quoting from *Owens* v. *State*, 120 Ga. 296, 298 [48 S.E. 21] "Unless the statement of the defendant is broad enough to comprehend every essential element necessary to make out the case against him, it cannot be said to be an admission of guilt." *Id.* at page 665. If it had been true that appellant did not know the gun was loaded or that he got the gun only for the purpose of frightening Chavez with it, he would not have been guilty of murder.

In the trial appellant testified as set out in the margin.[1]

[1]During the evening he put a quarter in the juke box and while he was turned around to talk to Nila, Chavez was pressing the knobs. He asked Chavez if he had deposited anything and Chavez said, "No," he had used appellant's quarter. They had a discussion about appellant's right to make the choices, and then Chavez sat down. Appellant was not mad. Chavez came over and grabbed the colored girl without saying anything, danced with her, and brought her back. When Chavez came back, Chavez said, in Spanish "I hope you didn't mind, . . . I know she's your girl, me dancing with your girl." Appellant said, "That's all right." Chavez left, went towards the back of the bar and sat and talked to somebody. Appellant was not angry at this time. He figured that Nila had wanted the girl to go with them so that she would be with Nila. At one point Chavez came over and interrupted him while he was talking to the girl. Chavez claimed that appellant was too young to be talking to the girl, as she was twice as old as appellant. After some time went by, he got up to go to the men's room. As he was walking back toward the end of the bar, Chavez jumped off his stool and bumped into him. He was thinking, "What's wrong with this guy?" He got a little excited, but didn't say anything to Chavez. He thought Chavez might follow him in there. He waited a few minutes, but Chavez didn't come in. When appellant came out, he sat next to Nila. He testified that Nila asked what happened, and he told Nila, "I don't know. The guy is drunk. He don't want to give me a break." Nila had told him he overheard Chavez ask the guy next to Chavez for a knife; Nila said, "Don't worry about it, . . . I have the gun with me, anyway"; he told Nila that if Chavez wanted to fight him, Chavez wasn't going to accomplish much because he was too drunk; Nila said to him, "No, in case you find he pulls a knife or someone jumps you on his side, I'll have the gun and I'll put up a bluff for you"; Nila told him the gun was in the car, but he didn't tell him where, and to go and get the gun for Nila; he went out to the car, returned to the bar with the gun, and gave it to Nila; that Nila tried to put the gun in his pants but it didn't fit; that Nila told appellant to hold it because appellant could hide it easier in his coat; he then sat down and had a beer and bought a beer for the girl; he went to go toward the record machine when Chavez asked him what he was looking at; he said he was not looking at anything; Chavez asked if the girl was his girl friend; he told Chavez she was not and that if Chavez wanted her, to take her; that she was nothing to him; Chavez put his hands in his pockets and started toward appellant; that appellant pulled out the gun and told Chavez, "You better take it easy there"; Chavez then said, in Spanish, "Chavalo cagado" which means "Little dirty kid in his pants." Chavez then came at him, and appellant fired a shot to scare Chavez; Chavez laughed, told him it was a toy gun, and he was going to shove it up appellant's ass; appellant backed up and Chavez came toward him and made a fast motion; Chavez was starting to take his right hand out of his pocket, as if he was going to reach out with his left hand

Nila testified that appellant told him someone was bothering him and had bumped into him; that appellant told him "this guy was buggin him"; that he told appellant about three times, "Don't pay attention to him"; appellant asked him for the gun and he told appellant he was just kidding; appellant left the bar and came in again; after appellant returned, he heard Chavez call him a little punk; that he then heard one shot; he turned around when the second shot was fired; he saw the gun in appellant's hand. He didn't see the gun until after the first shot was fired. Nila denied that he told appellant, "Be careful, he's got a knife." Nila testified he never saw a knife; he denied telling appellant that he had a gun in the car, to go out and get it and just hold it to protect himself. He could not remember whether Tagle talked with him after returning with the gun.

In summarizing his conclusions the trial judge stated: "Insofar as Tagle is concerned, this seems to me to be a useless type killing. Of course, all killing is useless. But there is absolutely no provocation whatsoever here. There isn't even a protestation from him that he was drunk. There is no knife, except maybe in the fanciful imagination of Tagle, and I don't even think that was there. He never once mentioned it to Officer Terry. The first time it comes up is in court. No one else saw a knife, not even Tagle saw a knife. He wasn't bothered by the other man. He wasn't even bothered by Chavez except for some, oh, let's call them piddling remarks, annoying remarks, that might have been some justification for a fistfight. I mean, I can see a fistfight. But to take the life of another man, another human being. This is, as far as I can see, a deliberate premeditated murder, nothing else. I can't see anything else. No other provocation, nothing; didn't come in the heat of passion. Suddenly some sort of provocation arises and the man pulls out a gun and he shoots. Certainly no self-defense; absolutely, positively, exclamation point. He goes out to the car and get the gun and brings it back in. Now, he had the audacity to tell us he didn't know it was loaded. Now, even if I believed that, he shoots once to the right side, nothing happens. The body

toward appellant; that appellant did not see any knife; that appellant then shot Chavez; after Chavez fell, Nila called to him and said "Let's go." That Nila then went out and started the car, and appellant climbed in the car window; that the girl came running out and told them to wait for her; that he told Nila to leave her there; that they then left.

doesn't fall. And what does he do? He shoots again. But this time he says, 'I aimed at him and I meant to hit him, I meant to shoot him.' Why? Deliberate premeditated killing, nothing else. I can't see anything else. I find the Defendant Tagle guilty of murder in the first degree.''

When appellant's written statement was made the police were in possession of the statements of Nila that appellant had shot Chavez, and evidently had also obtained a statement from Mary Martinez that appellant had not talked with her the night of the shooting, as he had claimed. When appellant was informed of these facts he made his statement. This is all the record discloses respecting the nature of the interrogation which accompanied the giving of the statement. Although the police knew from the statement of Nila that Tagle had shot Chavez and may only have asked Tagle how it happened the record contains so little of the conversation that it seems fair to assume that the statement was obtained in the course of an interrogation that lent itself to eliciting a confession or damaging statements.

The evidence was ample to prove that the crime was murder of the first degree, but this is not the question. Since the statements were not a confession our problem is to determine whether, if appellant's statement was inadmissible, it is reasonably probable that except for the error in its admission, the result of the trial would have been more favorable to appellant. (*People* v. *Hillery,* 62 Cal.2d 692 [44 Cal.Rptr. 30, 401 P.2d 382]; *People* v. *Dorado,* 62 Cal.2d 338 [42 Cal.Rptr. 169, 398 P.2d 361]; *People* v. *Jacobson,* 63 Cal.2d 319 [46 Cal.Rptr. 515, 405 P.2d 555].)

The question of guilt turned upon the judge's appraisal of the credibility of Tagle. There were two factors in the appraisal of his credibility; one that he had denied being in the bar and later gave the police a statement in which he made no mention of a knife, and still later gave his testimony about the knife and his fear of Chavez; the other factor was that his testimony was contradicted in vital particulars by the other witnesses to the shooting and the circumstances which tended to discredit him. We mention again the evidence that Chavez was good natured and laughing, had shown no anger and uttered no threats; that Tagle had no cause to fear Chavez and did not fear him when he armed himself with the gun, which clearly indicated it was not for self-protection, but for revenge. Also reflecting on his credibility was the improbable story that the unarmed Chavez

threatened to take the gun from him, and with his hand in his pocket, walked into the muzzle of the gun as if challenging Tagle to shoot him. There was also the circumstance that his testimony about handing the gun to Nila was wholly without corroboration. Can we believe that the trial judge could have regarded as an excuse for shooting down an unarmed man that he had his hand in his pocket and an unfriendly look upon his face as anything but a pure fabrication? And can we say it is reasonably probable that the trial judge would have believed that Tagle feared Chavez was about to attack him with a knife if there had been no evidence that Tagle had made a statement to the police in which he made no mention of a knife? We could not say so unless we could point to reasons for believing that the judge would probably have reversed his conclusions of fact, and we can find none.

To say that the result might have been different would not answer the question. ▓▓ As stated in *People* v. *Watson,* 46 Cal.2d 818, 837 [299 P.2d 243], a determination that a miscarriage of justice occurred ''must necessarily be based upon reasonable probabilities; otherwise the entire purpose of the constitutional provision would be defeated.''

▓▓ We have reached the conclusion that the result of the trial would probably have been the same if there had been no proof of the statements Tagle had made to the police. We are necessarily influenced by the fact that we are reviewing the findings and decision of a judge well qualified to determine the credibility of the witnesses and to resolve the issues in the light of experience and reason. This gives us assurance that we are not making a mistake in our belief that the evidence of Tagle's extrajudicial statements had little to do with the court's factual conclusions.

In view of the evidence to which the court gave full credit, which was destructive of the credibility of Tagle, we believe it highly improbable that that evidence would have been rejected and the testimony of Tagle accepted as the truth if it had not been inconsistent with some of his extrajudicial statements. To believe otherwise would cast doubt upon the ability of the trial judge to determine the credibility of witnesses and to weigh the conflicting evidence by processes of sound reasoning and the exercise of good judgment. It would be a mistake upon our part.

The conviction of murder of the first degree was not a

miscarriage of justice. There was convincing evidence of want of provocation for the killing and of deliberation and premeditation. There is no basis whatever for reducing it to a conviction of a lesser offense.

The judgment is affirmed.

Ford, J., and Kaus, J., concurred.

Appellant's petition for a hearing by the Supreme Court was denied January 12, 1966.