[Crim. No. 4314.   First Dist., Div. Three.   Feb. 18, 1965.]

THE PEOPLE, Plaintiff and Respondent, v. LYNWOOD JONES, Defendant and Appellant.

Robert R. Potter and Malcolm J. Rainsford, under appointment by the District Court of Appeal, for Defendant and Appellant.

Stanley Mosk, Attorney General, Robert R. Granucci and Michael R. Marron, Deputy Attorneys General, for Plaintiff and Respondent.

DEVINE, J.—This is an appeal from judgment of conviction of murder in the second degree.

## I. THE FACTS

### A. *The Victim*

The body of Alice Faye Jones, who, though having the same name, was not the wife of appellant, nor related to him, was found by her young son at about 6:40 p.m. on Sunday, August 12, 1962. Norris Finlayson, M.D., an experienced autopsy surgeon, testified that death was caused by strangulation, and that a considerable amount of force must have been applied in order to cause the injuries to the decedent's throat and neck. The instrument of strangulation was a scarf. The physician estimated the time of death to be a period from

6 a.m. to 4 p.m. The earlier time limit is not significant because there is no doubt that the victim was alive much later and was seen at various times in the early afternoon. The later limit is more important. The physician testified that the minimum period of time between the taking of the temperature of the body at 10 p.m. and the time of death was six hours, so that it is rather well established that the killing took place not later than 4 o'clock in the afternoon. The blood had an alcoholic content of .25 or .26.

From the whole record, it appears that the victim was a heavy drinker. She had been committed to the state hospital a year or so before the killing. She had a police record of narcotics violations, and she had many men friends.

### B. *Association of Appellant and the Victim*

Appellant and the victim were often together, and they had spent Friday night and Saturday immediately prior to the killing at appellant's apartment. They had had quarrels which had been heard by decedent's mother, and appellant would "get kind of unruly." Appellant and decedent would shove each other around, but the mother never saw him raise his hand to hit her daughter. On one occasion, about a month before the killing, the mother, Mrs. Cooks, heard her daughter scream, "Mother." The mother rushed into decedent's room, breaking a lock on the door. There she found her daughter sitting on the side of the bed, crying, with her hand under her chin, in a manner which the mother indicated but which is not described for the record. (However, we may take it that the gesture had to do with a hand at the throat, as the district attorney argued to the jury, since we must draw the inferences which are the most favorable to respondent, and particularly so because the trial judge denied motion for new trial.) The decedent asked appellant, who was sitting on a couch near the bed, why he didn't tell Mrs. Cooks what he was trying to do to her, and appellant responded that there wasn't anything wrong with the decedent.

### C. *Testimony of Witnesses Other Than Appellant*

On the morning of Sunday, the day of the homicide, appellant and decedent were together at the community kitchen of appellant's apartment house, where they were seen by Mrs. White, the last witness to identify the two together during decedent's lifetime.

On Sunday afternoon, witness Jackson, who lived on the second floor of 1759 Fillmore Street, directly under the dece-

dent's room, was in his apartment. He and a friend, one Smith, who also lived in the building, were listening to the baseball game on the radio. During the game decedent visited Jackson's apartment to borrow an iron. According to Jackson, this was during the third or fourth inning; according to Smith, it was about the sixth inning, or around 2 p.m. The baseball game that day commenced at 12:59 p.m. and ended at 3:21 p.m. The second inning ended at 1:41 p.m. and the seventh inning began at 2:41 p.m. While the decedent was in Jackson's apartment, Jackson heard footsteps overhead. Remarking that it might be appellant, decedent left Jackson's apartment and went upstairs. Sometime after this, Jackson heard someone sit on the bed in decedent's room. He could not be exact about the time, but mentioned an hour after decedent left him as a possibility.

At about 2:45 or 2:50 on Sunday afternoon, after attending church and having supper at a relative's, Mr. Cooks, decedent's stepfather, entered 1759 Fillmore Street to go to his apartment on the third floor. He found the door between the second and third floors locked. There was an inside bolt. He attempted to unlock the door with his key, banged on it, and tried to kick it down, but all to no avail. He then went across the street to purchase a package of cigarettes. When he returned, about 10 or 15 minutes later, he was able to get in the door which had previously been locked. He went up to his apartment, passing decedent's room, but he did not look in, nor did he hear any noise. From 3:10 until 4:45 p.m., Mr. Cooks heard no noise from the decedent's room and he saw no one.

After the baseball game was over, sometime between 4:30 and 5 p.m., appellant came to Jackson's apartment and said, "Check on your daughter. The last time I saw her she was in bad shape." Jackson had no daughter, and appellant had never before referred to the decedent as his daughter, but Jackson had looked after the decedent and had been protective towards her because of her alcoholism. Jackson did not go up to check on the decedent because he did not understand appellant. At this time, appellant appeared to Jackson to be drunk.

D. *Appellant's Statements to Police.*

1. *Statement of Monday, August 13, 1962.* Appellant was first interrogated by Inspector Curtin of the San Francisco Police Department at 1:30 a.m. on Monday, August 13, 1962.

At that time, appellant stated that the decedent came to his place Friday night as he was preparing to go to work. He left his keys with her, and when he returned from work the next morning, she was in his room. After he had done some shopping and had tried to cash a check, they went to bed and did not arise until 9 o'clock that night. They then visited a few taverns, returning to his place after 2 a.m., Sunday, the day of the homicide. When they awoke Sunday morning, they had sexual intercourse. They talked of going to the beach, and the decedent wanted to change her clothes. At 1:15 p.m., they left appellant's apartment. On the way, appellant remonstrated with decedent for drinking wine from a bottle as they walked. They arrived at decedent's place at about 2 o'clock. The decedent was talking about what to put on, and appellant told her to change, that he would be back. He then left. When he returned a short time later, as he was knocking on her door, she came up from downstairs, saying that she had tried to borrow an iron. They entered her room at about 2:30 p.m. While decedent put on a pair of Capri pants, appellant stood outside in the hallway. When they subsequently went downstairs and out onto the sidewalk in front of the apartment building, the decedent changed her mind about going to the beach. As appellant started to walk away, decedent called him back and told him, ''You see that man across the street? That is Pasquale. He doesn't like me to be associating with other people.'' Appellant then left her; the time was about 3 p.m. After having a few drinks, he went home.

2. *Statement of August 16, 1962.* It will be observed that in his original statement to the police, appellant made no reference to the visit to Jackson. The police confronted appellant, at the second interrogation, with his failure to speak of the visit to Jackson. He replied that the reason he had not told the police was that he was afraid and knew there was something wrong. Appellant described the position of the victim on the bed, which corresponds substantially with the photographs of the body which were taken by the police.

E. *Appellant's Testimony at the Trial.*

At the trial, appellant's testimony generally followed the revised account which he had given to the police. He also gave his own version of the incident described by Mrs. Cooks. According to appellant, decedent was crying because her mother did not want her to rear her child and wanted her to go back with Schools, another male friend of decedent. When

Mrs. Cooks heard decedent crying, she broke into the room and asked decedent what was the matter. The decedent told appellant, "You tell her." Because appellant did not wish to become involved in a family matter, he said, "There isn't anything wrong with her, Mrs. Cooks." Appellant denied that decedent had screamed, and thus put his testimony directly in contradiction with that of Mrs. Cooks. Appellant's testimony also conflicts with that of Mrs. Cooks in that his account of what decedent said is simply, "You tell her"; while Mrs. Cooks' testimony is that decedent said, "why don't you tell mother what you were trying to do to me?"

Appellant's testimony also collides with that of Jackson. Appellant testified that he told Jackson that decedent (by what designation he referred to her is considered below) "is out *up* there" and to "go *up* there" and that she was "in bad shape *up* there." (Italics added.) In his second statement to the police, appellant had said that he had told Jackson "to go upstairs, that Alice was drunk, and that she needed help." Jackson's testimony is that appellant did not say that Alice was in bad shape at the time, but that the last time he saw her she was in bad shape. He testified that appellant did not say, "Go up and see," but just said, "Check on your daughter."

There is further contradiction and discrepancy in the matter of appellant's naming of decedent in his conversation with Jackson. When appellant first told the police about the conversation (it will be recalled that this was at the second interrogation, because he made no reference to the subject at all in the original one), he was asked if he had referred to decedent as Jackson's daughter. He denied that he had done so. At the trial, Jackson testified that appellant did not mention decedent by name, but called her "your daughter." After Jackson's testimony had been given, appellant said he did not know which appellation he had used, either "your daughter" or "your girl Alice." Finally, appellant's testimony is in contradiction with that of Jackson in this respect: Appellant testified that when he told Jackson that decedent was "out . . . drunk or sick or something," Jackson replied, "She is all right. She will be all right after a while, just like she always is." Jackson denied this. Jackson testified that appellant was intoxicated, but appellant denied that he was, and his testimony is that in the whole day he had no more than one Vodka Collins and about two and a half beers.

At one point in his testimony, appellant states that he was

"a little excited" when he discovered decedent lying on the bed, that he did not know "if she was drunk or had had an epilepsy spell or what"; and in replying to a question why he should have been excited to have found her to be drunk, he said, "I never seen her lying half way on the bed like that and her pants down." Although, by his own admission, he knew her condition to be serious, he made no further investigation and rendered no assistance except to make the report to Jackson. He did not attempt to have Jackson go with him back to the room. He testified that he "started home." He went to bed about 6:30 p.m.

F. *Physical Evidence.*

The prosecution produced three items of physical or demonstrative evidence.

1. Photographs of the premises and of the victim's body. Her room was exceedingly small. The door opened almost directly towards the bed, which was very near. The upper part of the body is lying on its back on the bed, but the legs are extended to the floor. One thigh is extended through Capri pants, but the other leg is unclad, and almost the whole of the victim's body, from the abdomen down, is naked. The position of the body, half on and half off the bed, is such as to suggest to anyone at first sight that the woman is not in the repose of sleep. A slip, or undergarment, appears to have been pulled up. Over this is a sweater. A scarf is around the throat. One hand almost touches it.

2. A pair of appellant's shorts, taken from his room, had a semen stain. This, however, is not of much significance, even though spermatozoa were found in the victim's vagina. There was no attempt to show that appellant had produced this. Besides, appellant testified, and had told the police in his original story, that he had intercourse with the victim on Sunday morning.

3. Two notes written by decedent to appellant were found by the police in appellant's room. These notes indicate a disagreement, but they do not indicate the time. Appellant testified that they were written by decedent on Saturday, the day before her death, and that the reason was merely his undue delay in returning from a shopping tour. But one of the notes is susceptible of the inference that decedent and appellant were thinking of breaking off their relationship. It says: "All jokes aside, I waited for you to return but I guess you mean what we were talking about this morning so, I think I had better cut out. , I won't say I don't know I

came into this thing with my eyes wide open. So have a Good Time Baby & I'll Be Seeing You. A''

The defense offered one item of physical evidence, a photograph of deceased, which appellant testified was taken with a Polaroid camera on the morning of her death. The back of this picture is inscribed, ''To Lynn, Love, Alice.''

G. *Summary of the Evidence Against Appellant.*

The case against appellant is this: He is the last known person to have been in the company of the victim; he was with her, according to one of his statements, until 3 o'clock in the afternoon; and she was dead, according to medical testimony, no later than 4 p.m. and, of course, possibly earlier. At a time about 2:45 p.m. the door to the upper story was bolted from the inside, which would give opportunity to the killer either to perpetrate homicide or to avoid immediate detection (the door to the room itself could not be locked, the lock having been broken in the earlier incident of Mrs. Cooks' dash in reply to her daughter's outcry). Appellant's story of departure because of decedent's alleged change of mind need not have been believed by the jury; appellant said he found the victim lying on the bed in the manner described above, and the jury reasonably could conclude that this was not true because a person viewing the body at such short range could not but have observed that Mrs. Jones had been the victim of homicide and, indeed, could not have failed to see the scarf around her neck; appellant gave an unreasonable account of the condition of Mrs. Jones to Jackson. Appellant concealed from the police, at the original interrogation, his alleged discovery of his companion, and concealed from them his conversation with Jackson; he would have led the police to believe that he had not seen decedent since he left her at 3 o'clock. Appellant had quarreled at other times with decedent; and it is inferable from evidence recited above that on one occasion he attempted to choke her. Appellant's testimony conflicts with the testimony of other witnesses in several respects, as related above. Decedent's note gives evidence of a disagreement more serious than that which would arise from overstaying a shopping tour, and refers to an earlier conversation which would seem to have related to a severing of relations.

H. *Defense.*

The defense relies upon weakness of the prosecution case, which, of course, is almost wholly based on circumstantial

evidence; appellant's own testimony of his leaving Mrs. Jones; his continued denial of guilt; the testimony of Mrs. Chastang; the opportunity for others, and in particular, Pasquale, to have committed the crime; the fact that Pasquale had told decedent that if he couldn't have her, no one else could, and the evidence from decedent's mother that she had been told that a few days before the homicide Pasquale was "trying to kill" Alice, apparently in an episode of battery;[1] and testimony of two witnesses as to appellant's good reputation for peace and quiet, testimony which was not challenged by cross-examination about any prior offenses.

Mrs. Chastang testified that about 3 p.m. on Sunday, she saw decedent with a tall, light-complected Negro. As she watched, decedent and this man walked to the steps of the decedent's apartment house, stood there for a while, and then went upstairs. The man was not appellant, Schools, Mr. Cooks, or Pasquale. Although Mrs. Chastang kept watching until almost 4 p.m., she did not see decedent come back out, nor did she see anyone that she knew go into the decedent's house.

Mrs. Chastang's testimony, however, is not necessarily reliable. She did not recognize the deputy district attorney who had visited her a few days before the trial. Moreover, she testified that decedent was wearing a blue skirt at the time. At about 3 o'clock, when appellant says he left decedent, she was wearing black Capri pants. When she had entered her dwelling with appellant about an hour earlier, she had been wearing a blue skirt.

## II. Sufficiency of the Evidence to Support the Verdict

█ On appeal, the function of the court is not to determine whether the ultimate findings were established beyond a reasonable doubt, because that function lies within the exclusive jurisdiction of trial judges and juries. (*People* v. *Scott*, 176 Cal.App.2d 458, 497 [1 Cal.Rptr. 600].) █ The rule that circumstantial evidence must be consistent with guilt and inconsistent with any reasonable hypothesis of innocence, is a rule of instruction for the guidance of the jury. (*People* v. *Cullen*, 37 Cal.2d 614, 625 [234 P.2d 1]; *People* v. *Newland*, 15 Cal.2d 678, 682 [104 P.2d 778].) █ After con-

---

[1]Pasquale was not produced as a witness. An inspector testified (hearsay on cross-examination, but not objected to) that Pasquale had told him he saw the decedent with somebody at about 1 o'clock, from across the street, but did not identify Jones.

viction, all intendments are in favor of the judgment and a verdict will not be set aside unless the record clearly shows that upon no hypothesis whatever is there sufficient substantial evidence to support it. (*People* v. *Kerr,* 37 Cal.2d 11, 16 [229 P.2d 777] ; *People* v. *Lindley,* 26 Cal.2d 780, 791 [161 P.2d 227].)

Applying these rules of law to the testimony recited above, we cannot say that there was not substantial evidence for the verdict of the jury. The verdict gains strength from the fact that the *judge denied motion for new trial.*

Support for judgment of second degree murder, rather than manslaughter, is to be found from the provisions of section 1105 of the Penal Code, there having been no proof of circumstances of mitigation, justification or excuse; from the manner of the killing; and from defendant's conduct following the homicide. (*People* v. *Ogg,* 159 Cal.App.2d 38, 51 [323 P.2d 117].)

### III. INSTRUCTIONS

1. Appellant complains of the giving of the instruction on first degree murder. He argues that there was no evidence to sustain a first degree murder, and that the giving of the instruction made it more likely that the jury, concluding that first degree could not be sustained, would select second degree as appropriate; but if only second degree and manslaughter were available verdicts, they might well have selected the lesser of these. Although the district attorney's argument to the jury seems to have pointed toward second degree rather than first, nevertheless it was pointed out to the jury that the use of such force as was needed to effect the strangulation could show a deliberate intent to kill, such as to justify first degree. This was, at least, an arguable theory upon which the court properly instructed the jury. Moreover, counsel for appellant at the trial agreed that instructions on the two degrees of murder should be given. No case has been cited to support the proposition that the giving of an instruction on a higher degree than that of which the appellant has been convicted is error; but even if it would be error in a case where no justification for the instruction could be offered, this is not such a case.

2. Although, as stated above, appellant's counsel said he did not wish instructions on manslaughter because his position was that defendant did not commit the crime at all, the court did instruct on involuntary manslaughter. Ap-

pellant now argues that error was committed when, the jury having returned for further instruction at the court's instance, the judge suggested that they first arrive at a decision whether the accused were guilty of some offense, and if they so decided, discuss the "degree." He argues that since manslaughter does not have degrees, this indicated to the jury that they should bring in a murder verdict. But, within a sentence or two, the judge referred to involuntary manslaughter, and we are satisfied that the jury understood the judge to be referring to the possible grades of homicide, including manslaughter.

3. Appellant argues that an instruction on voluntary manslaughter should have been given. The court specifically asked counsel if, because of the position of the defense, which was simply that the defendant did not commit the crime, instructions on manslaughter should not be given. Counsel replied, "That is correct." Appellant argues that the court should have given the instruction on its own motion. Appellant's argument is that there was evidence that appellant and deceased used to get into some pretty stiff arguments and that they shoved each other around. There is also evidence of appellant's being drunk on the day of the homicide. If, however, the court should have instructed on voluntary manslaughter on its own motion in the absence of any expression of counsel for the defense, we do not believe that the court should have done so when counsel had expressed himself as just stated. Counsel for defendant might well have deemed an instruction for manslaughter to be logically incompatible with the claim that he was not the person who committed the crime. (See *People* v. *Dixon,* 192 Cal.App.2d 88, 91 [13 Cal.Rptr. 277].)

4. An instruction was given that evidence of statements made by the deceased that the defendant had threatened her with harm was received for the sole purpose of showing the state of mind of the deceased, and that the evidence that she made those statements does not in any way tend to prove that defendant actually made those threats, if any. Appellant contends that this was prejudicial because there was no evidence of threats made by defendant. [9] Evidence of prior assaults, however, is admissible. *People* v. *Hopper,* 145 Cal.App.2d 180, 196 [302 P.2d 94]; *People* v. *Lint,* 182 Cal.App.2d 402, 415 [6 Cal.Rptr. 95].) The instruction obviously referred to the incident testified to by Mrs. Cooks. This, it is true, was something more than a threat. But we

do not think the jury was misled. No other evidence of threat by defendant was produced, nor was any referred to by the district attorney in his argument to the jury, although he did refer to the incident of physical violence or the attempt at it.

5. Appellant also finds fault with a direction by the judge, when the jury returned for further instruction, that the jury would not have occasion to consider manslaughter unless it found that the defendant was intoxicated, since appellant had insisted that he was completely sober at all times on the afternoon of the homicide. He argues that the court destroyed the possibility of a manslaughter verdict. However, the only theory on which involuntary manslaughter could have been selected as the right verdict, once the jury had found defendant guilty of the homicide, was that he had committed an unlawful act not amounting to felony, namely, battery. The strangulation of the victim by such force as was described by the autopsy surgeon could hardly be thought to be mere battery, and the judge, in giving this as a possibility in case the jury found the defendant to have been drunk, despite his protestation to the contrary, probably gave to the accused a more lenient interpretation than was warranted.

## IV. APPLICATION OF THE DORADO RULE

The question before us is whether the two statements, or either of them, made by appellant to the police should have been ruled inadmissible because appellant had not been advised of his right to counsel. The first of these statements commenced at about 1:30 a.m., Monday, August 13, 1962, about seven hours after the finding of the body. This statement contained nothing in the nature of a confession. Jones said that he left the deceased at about 3 o'clock. At this time, she was, according to appellant's declaration, standing on the outside steps of the building. The police did not arrest appellant and he was at liberty for about four days after making this statement. The inspector in charge testified that several times he asked Jones if he had "any ideas who he thought might do it" and the police "would run them out."

The right to have counsel present does not extend to that earlier phase, the investigatory one, which is prior to the accusatory stage. (*People* v. *Dorado,* 62 Cal.2d 338, 354 [42 Cal.Rptr. 169, 398 P.2d 361].) The fact that, at the investigatory stage, answers given or a story related by one who later is accused may be damaging to him does not, therefore, render the declarations inadmissible.

Appellant's second oral statement followed naturally from the first. The police had discovered that, according to Jackson's statement, an extremely significant omission had been made by appellant, namely, that he had seen the victim stretched out on the bed, in bad shape, and this at a time when, according to the autopsy surgeon's testimony, she was dead.

The *Dorado* rule applies only when (1) the investigatory stage has been converted to an accusatory one, that is, when suspicion has begun to focus on a particular suspect; (2) the suspect has been taken into police custody; and (3) the police have carried out a process of interrogations that lends itself to eliciting incriminating statements. (*People* v. *Dorado*, p. 354.)　　As to (1): It does not appear that the accusatory stage as to Jones had yet been reached. The story of Jones' encounter with Jackson had been given to the police by one person only, namely, Jackson. It was quite possible that Jones would deny this story, and that the story would appear to have been an attempt on Jackson's part to divert suspicion from himself. Jackson was vulnerable to impeachment as an ex-felon, having been convicted of pimping. Jones did admit the encounter, but the police, from all that appears, did not know when they began the questioning that he would do so. As to (2): Whether Jones was actually in custody at the time is not perfectly clear, but there is testimony that he had been brought back to an office of a police detail; and we shall assume that there was actual custody. As to (3): As stated under (1), there is nothing to show that the police had yet focused suspicion on appellant. Their questions were not necessarily adapted to eliciting incriminating statements. An inspector testified that the inquiry was ''for the purpose of clarifying some of the discrepancies that he told us'' and that they had brought him back ''to explain.'' We believe the rule of the *Dorado* case was not violated.

In any event, we believe there was no prejudice. Appellant, having made the first statement, with its gross omission, would have had to give an explanation sooner or later. True, he could have refrained from testifying, but this would have left the visit to Jackson and the remarks to him about the deceased unexplained. There would still have been the cogent evidence of the photographs.

Judgment affirmed.

Draper, P. J., and Salsman, J., concurred.