[Crim. No. 169.  Fifth Dist.  Jan. 3, 1966.]

THE PEOPLE, Plaintiff and Respondent, v. FRANK MARTINEZ et al., Defendants and Appellants.

162

Sandell, Carter & Hill and George A. Carter for Defendants and Appellants.

Thomas C. Lynch, Attorney General, Raymond M. Momboisse and Nelson P. Kempsky, Deputy Attorneys General, for Plaintiff and Respondent.

BROWN (R.M.), J.—The defendants-appellants, Frank Martinez and David Martinez, appeal from the judgments entered by the court, a jury trial having been waived. By an information filed on September 22, 1964, the defendants were charged by the District Attorney of the County of Fresno with murder in violation of section 187 of the Penal Code, assault by means of force likely to produce great bodily injury in violation of section 245 of the Penal Code, and conspiracy to commit the crime of disturbing the peace in violation of section 182 of the Penal Code. Both defendants

were found guilty on all three charges. The degree of murder was fixed at first as to Frank, and second as to David. Probation was denied and each defendant was sentenced to the state prison for the term prescribed by law, the sentences for each count to run concurrently.

Defendants present three issues on this appeal. First, they contend that all statements and confessions were obtained from them in violation of their right to counsel and their right to remain silent and were improperly introduced in evidence. Second, they contend that testimony received from four witnesses was improper. Third, defendants contend that the evidence is insufficient to support findings of guilt on any count.

Viewing the evidence in the light most favorable to the People, the record shows the following facts:

On February 22, 1964, a group of male individuals known as the "Park Side" gang attacked another group, severely beating one John Verdugo, a friend of the defendants here involved. About February 26th or 27th several friends gathered at a service station where one Henry Felix Rodriguez worked. They included the appellants, Frank and David Martinez, as well as Alex Martinez, Tony Mendez and John Verdugo. Rodriguez remained outside the car; all other persons present were within the car. A discussion ensued as to getting even with the "Park Side" gang and it was decided to "jump them back" and fight them again. Rodriguez was unable to identify the person who said the group should "jump them back" but it came from someone in the car with Frank and David. This discussion centered around the possibility of a fight the next day, which never took place.

On February 29th, a group of individuals met at the home of Bobby Valenzuela. There is no evidence that the appellants were members of this group. A further discussion was had relative to "jumping" the "Park Side" gang at a dance to be held at the Fresno Memorial Auditorium that night. The group then went to the home of Tony Mendez, where they met in the garage. Present were appellant Frank Martinez, his brother Alex Martinez, Tony and John Mendez and Henry Rodriguez. A discussion took place concerning initiating a fight that night with the Park Side gang. Someone asked Rodriguez, "We going to meet them or not?" He replied, "I guess I am ready." Rodriguez understood the exchange to mean they were going to go fight the Park Side gang. Frank Martinez was present during the conversation

but David showed up right afterwards. There is no direct evidence that he was there during the conversation.

The group left in either two or three cars. David drove a car owned by Tony Mendez. After going by some other places they arrived at the Memorial Auditorium. There is evidence that they had prepared themselves for a fight with sticks and chains. David had a dog chain, doubled over, and bound with black tape. Frank carried a short knife with a curved blade, similar to a grape knife. The group, which included Frank and David Martinez, went to the front of the auditorium. Someone turned the sprinklers on and the group moved to a parking lot across the street in the area of the "free market" premises. A stranger, John Charles Smith, was in his parked Thunderbird car at the parking lot. Some of the group approached the Thunderbird and beat upon it with chains or metal bars. Smith rolled up his windows and drove off rapidly.

At about this time, which was approximately midnight, two couples left the dance in the auditorium and exited through a side door on the opposite side of the street from appellants. The young men were Jerry Stubblefield and Jesse Francis Ake. The two young men and the two girls they were escorting walked down the sidewalk toward their parked car. Someone in the group of which the appellants were a part yelled, "Let's go get them" or "Let's get the white paddies." Three or four of the group ran across the street toward the two couples. Stubblefield glanced back and saw the group coming. He was then hit on the head with a stick by a person later identified as Juan Zavala. Stubblefield and Ake told the girls to run, and turned around to face their attackers. Stubblefield was hit three or four more times on the head and shoulder and then was grazed on the back by another blow. Ake turned to help Stubblefield and pulled him away from a blow. Then Ake jerked and doubled over, as if he had been hit. He said, "Let's get out of here" and the two young men hurried to the corner where the girls were waiting. Ake then said, "I have been stabbed," and fell. He died within a few minutes from massive hemorrhage caused by a stab wound in the heart.

Appellants first contend that several statements and confessions taken from them were received in evidence in violation of the rule established by *Escobedo* v. *Illinois*, 378 U.S. 478 [84 S.Ct. 1758, 12 L.Ed.2d 977], and *People* v. *Dorado*, 62 Cal.2d 338 [42 Cal.Rptr. 169, 398 P.2d 361]. It will be remem-

bered that *Escobedo* was decided in June 1964, that *Dorado* was first handed down on August 31, 1964, and a rehearing granted in September 1964. Trial of this case commenced on November 24, 1964, and the statements were admitted into evidence on December 10, 1964. Subsequently, in January 1965, *Dorado* was filed. This case thus fell in the twilight zone between *Escobedo* and the final opinion in *Dorado*. Although the latter case was set at large by the order granting a rehearing, the fact of its pendency before the Supreme Court cast a long shadow over the criminal trial proceedings in this matter, as will be mentioned hereinafter.

First, disposing of an overall point raised by the People, it is urged that defendants failed to object to the admission of their statements on the particular ground they had not been advised of their right to counsel and their right to remain silent. The cases have held, both expressly and by clear implication, that where the trial occurs after *Escobedo*, failure to object in the court below precludes the defendant from raising the point on appeal (*People* v. *Perez*, 62 Cal.2d 769, 774 [44 Cal.Rptr. 326, 401 P.2d 934]; *People* v. *Davis*, 62 Cal.2d 791, 795-796 [44 Cal.Rptr. 454, 402 P.2d 142]; *People* v. *Palmer*, 236 Cal.App.2d 645, 650 [46 Cal.Rptr. 449]). The record discloses that the appellants objected to the introduction of the statements primarily and most vigorously on the basis that they were involuntary and had been obtained by inducement and threats; but it further discloses that the objection ran to violation of the rights of the defendants as enunciated in *Escobedo*, and such objection was fully understood by the court and the prosecuting attorney. After *voir dire* proceedings relative to the statements the court mentioned the *Dorado* case for the purpose of pinpointing the arguments to be made by counsel. It pointed out that rehearing had been granted so the *Dorado* opinion, as first written, was ''not the supreme law'' of this case; but that *Escobedo* and any other federal cases relating to the point were applicable. The prosecuting attorney argued that the defendants were advised of their rights; that Frank was advised that he did not have to tell the police officers anything; that no one could make him say anything; that he could have any counsel that he wanted; that the defendants had an opportunity to talk with a friend whom they trusted and who was present to help them and the advice he gave them was what many attorneys would have given them. Defense counsel argued, in part, that although the *Dorado*

case was not the law at the time of the trial, the defendants were not advised of their rights; that the statements made by the interrogators on which the People rely did not suffice for this purpose; that it implied they had had such right but the right had been ''withdrawn'' ''because it had not been utilized before they had been picked up by the officers.'' Counsel for the defendants then argued the factors which the courts take into consideration such as the age of the suspect, his intelligence, the fact that he is in custody, how many officers were present during the interrogation, and the time of day. Counsel then applied those factors to the defendants and the circumstances of this case, and urged the importance of the right to counsel at the interrogatory stage. The record also discloses that defense counsel provided the court with written authorities in connection with his arguments on constitutional points. Thus, although the basic objection was that the statements and confessions were involuntary, as an element of claimed involuntariness, both the prosecutor and defense counsel argued with specific reference to the right to counsel and the right to remain silent. The record shows that the trial judge fully understood that violation of these important rights was one of the bases of the appellants' objections to the introduction of their statements. The argument of the People in this respect is therefore without merit.

The various statements of the defendants and their final formal confessions were obtained under the following circumstances: Clifton Clinger, a police officer of the City of Fresno, went to the school attended by Frank during the morning of Friday, March 6, 1964, and requested Frank to come to police headquarters for questioning. This defendant was not then placed under arrest. At that time it was unknown whether he was a witness to, or a participant in, the events of February 29th. He was questioned in an interrogation room, which was ''bugged,'' for 45 minutes to an hour. After preliminary questions and brief answers, William Daly, an assistant district attorney, told Frank: ''We are talking to you as a witness. You understand you are here as a witness? We expect you to talk to us. We want you to talk to us. We can't force you to tell us a word. We only want you to tell us what you want to.

''And, you are, of course, entitled to any counsel you want on it. You've had plenty of time to talk to your parents or attorney or anybody else you want to about this whole thing. And I will warn you that if you withhold information or if

you—if you give us false information, you can be guilty of a very serious crime.''

In answer to the ensuing interrogation, Frank related details of his innocent activities during the early evening of February 29th, and admitted that he and a group of friends went to the auditorium, arriving there about 10:15 p.m.; that they walked from their parked car to the corner but did not cross the street to the auditorium; that they talked for some 20 minutes, then returned to their car; that they did not see any fights while they were there; that at about 10:30 p.m. they left the parking lot and drove to the Mendez home arriving at about 10:35; and the defendants then returned to their home. At the termination of the questioning Frank was arrested on the charge of conspiracy to obstruct justice in violation of section 182 of the Penal Code.

David Martinez went voluntarily to the police department after he had a telephone call from a friend suggesting that he do so. He arrived sometime between 1 p.m. and 3 p.m. on March 6th. After waiting about an hour in the waiting room, David was taken into an interrogation room for questioning. This interrogation lasted about an hour and a half. With minor discrepancies he related substantially the same story as had been told by Frank, i.e., his innocent activities of the early evening, the trip to the auditorium, that they did not cross the street but did walk to the corner, that people leaving the dance at the auditorium told them it wasn't any good, that they saw no fights while they were there, that he left for the Mendez home about 10:30 p.m. and arrived at the defendants' home by 10:45 p.m. The only advice concerning the rights of David here under consideration came when the interrogation was about half-way finished and David's story substantially told. William Daly, the assistant district attorney, stated to the defendant: ''All right. Like the officer says, if you got nothing to hide, if you didn't do anything and you have absolutely nothing to hide, you are not going to give us some bunch of baloney. You are going to tell us the truth down the line. Now, I leveled with you because I told you what we have. And you know, like he says, you don't have to talk to us. We are not going to make you answer any questions you don't want to answer. But we leveled with you. We told you what we have, what information we have, where we put you and where we put you at midnight. Now, you have had plenty of time to talk this over and have any counsel you want. And we want you to tell us the story.''

The officers continued their unfruitful interrogation for about another 45 minutes; David steadfastly denied that he was at the auditorium at the time of the murder. At the conclusion of the interrogation he was placed under arrest for conspiracy to obstruct justice. (Pen. Code, § 182.)

After being booked, David telephoned his home and talked to his sister, telling her that he was in jail but not to worry. He did not ask for an attorney.

For several months prior to March 6th, David had been employed in a gasoline service station owned by John Arnold, Sr. John Arnold, Jr., also worked at the station. At about 9 o'clock on the evening of March 6th, John Arnold, Jr., telephoned the Martinez home to ascertain why David was not at work and learned from Alex Martinez, a brother of the defendants, that David was being held by the police. Arnold, accompanied by his wife, went to the Fresno Police Headquarters for the purpose of posting bail for Frank and David so the latter would be free to work the next day. Upon arriving at police headquarters, Arnold saw Jack Kelley, a police officer whom he had known for about 10 years. Upon learning that the Martinez brothers were being held because of possible involvement in the murder, he informed Kelley that the police must be holding the wrong people. He asked permission to see the defendants. Kelley told Arnold that it was not his case. Kelley spoke to Sergeant Hirzel, the duty sergeant, who first said that Arnold would have to obtain permission from the district attorney; then, when Arnold said he believed he could get the truth from the defendants, Hirzel gave permission or arranged for permission for Arnold to see David. Kelley and Arnold walked over to the jail and David was brought to them in an interrogation room. Arnold believed that defendants were not involved in the assault and murder but that they were shielding someone. The purpose of his questioning was to get them to tell who, other than themselves, might be involved so the defendants could be released. The conversation which ensued was not introduced into evidence in a reported verbatim form; rather, Kelley and Arnold, the latter reluctantly, testified as to its contents. Arnold did most of the talking and questioning. At first David denied any connection with the crimes. Arnold asked David if he was involved and David answered ''No.'' He asked whether David knew who was responsible, to which David replied ''Yes.'' During the early part of the conversation, David asked for information as to the penalty for mur-

der and about the degrees of murder. Kelley joined in the conversation, giving the requested information. David asked to speak with his brother and Frank was brought to the interrogation room. Kelley left the room several times for brief periods. On one occasion, the defendants asked if they could talk alone. Kelley left but Arnold remained in the room. The defendants conversed in the Spanish language. They then told Arnold, "We did it." Arnold testified also that "Frank said that he was involved, that he did it." Arnold asked Kelley to come back in. The defendants then gave Kelley a statement, discussing the occurrence in detail.

Officer Kelley testified as to the contents of the statement. Frank told them where the knife was at his mother's home; and David told them where the chain that he used was hidden. Frank explained that the Park Side and the West Side gangs had had a fight several days or weeks prior to February 29th; that one of their group had sustained a broken jaw; that they went to the auditorium where they saw several members of the Park Side gang but nothing materialized; that they saw several couples leave the auditorium; that he and David went across the street and started a fight with Ake. He admitted that he had the knife at that time and that he had cut Ake, demonstrating how he held the knife. He said he and David then took a group of fellows home and went to their own home; that he first put the knife in a vacuum cleaner bag, after wiping blood from it; that the following day he removed it and placed it in the back yard.

Officer Kelley took David to the Martinez home where David showed him the location of the knife and chain which the defendants had hidden. David was then returned to the police station.

Shortly thereafter, on the morning of March 7, 1964, at police headquarters, both Frank and David were interrogated at length and made full confessions of their participation in the assault, murder and conspiracy to breach the peace. These statements, in question and answer form, were reported by a certified court reporter, and were read into the record.

Under the *Escobedo-Dorado rule,* incriminating statements are rendered inadmissible if, at the time they were made, four things concur: "(1) the investigation was no longer a general inquiry into an unsolved crime but had begun to focus on a particular suspect, (2) the suspect was in custody,

(3) the authorities had carried out a process of interrogations that lent itself to eliciting incriminating statements, (4) the authorities had not effectively informed defendant of his right to counsel or of his absolute right to remain silent, and no evidence establishes that he had waived these rights.'' (*People* v. *Dorado, supra,* 62 Cal.2d 338, 353-354.)

In the present case, six statements are under consideration, each made under different circumstances. The appellants argue at large, making no attempt to differentiate between the various statements or to apply to each the factors of *Dorado.* The main thrust of their argument relates to the contention that the defendants were not effectively advised of their right to counsel or their right to remain silent. They point out that David was 19 years of age and Frank was 18 years of age at the time of the crimes. It is argued that while Frank was advised that he was entitled to counsel, the advice, followed by the statement ''You've had plenty of time to talk to your parents or attorney . . .'' was insufficient to advise the defendant Frank that he had a right to have counsel present at the time of interrogation and would imply that this right no longer existed. As to David, the defendants contend that the statement made to him by Daly, ''Now, you have had plenty of time to talk this over and have any counsel you want'' cannot be considered to be advice of a right to counsel at the interrogation stage of the proceeding. It is argued that when David was told ''We are not going to make you answer any questions you don't want to answer,'' coupled with the statement that when he got over in court and somebody said it was he who stabbed the victim, he would be sorry and want to talk but the officers would not then listen, he was not effectively advised of his right to remain silent.

The People answer that both appellants were effectively told of their absolute right to remain silent and of their right to the assistance of counsel. Their failure to take action after being given the advice shows a waiver of the right to counsel and precludes them from raising it on appeal. The People contend that the real question involved is how long the defendants remained effectively informed of their rights after being advised of such rights. It is submitted that they would remember such basic and important information for at least the period of 12 hours during which all of their statements were made. (See *People* v. *Garner,* 234 Cal.App.2d 212, 224-225 [44 Cal.Rptr. 217].)

Assuming, without deciding, that the advice given to the defendants was insufficient to effectively advise them of their right to the aid of counsel at the interrogatory stage and of their right to remain silent, then the factors set forth in *Dorado* as the test of inadmissibility must be applied.

At the time the first statements were made on March 6, 1964, the investigation was still a general inquiry into an unsolved crime, and had not begun to focus on a particular suspect. The interrogating officers made it clear to both Frank and David that they did not know whether they were mere witnesses, in which event they did not have to worry, or whether they were participants. At that time the police were holding about 12 other boys. The questions asked clearly show that the officers were seeking general information about the factual circumstances surrounding the crimes. As the Attorney General points out, the obvious conclusion is that the police believed that a murder had been committed, but did not know who, of more than a dozen people, had been the perpetrator of the crime. The first factor of *Dorado* is not met, and the statements were properly admitted. (*People* v. *Jones*, 232 Cal.App.2d 379 [42 Cal.Rptr. 714]; *People* v. *Beverly*, 233 Cal.App.2d 702 [43 Cal.Rptr. 743].)

The People also argue that the appellants were not in custody. It is pointed out that a police officer went to the school which Frank attended and requested him to come to police headquarters, which he did. He was not placed under arrest. While waiting in an office or the waiting room, no one watched him or guarded him. He was called from a classroom at the behest of a police officer and requested to come to the police department for questioning. He submitted to the authority of the police uniform and accompanied the officer. He was not specifically guarded or watched while sitting in the office or waiting room.

As to David, he voluntarily went to the police department. There is no indication in the record that the police were looking for him. As the trial court put it, he went "to fence with the police officers." The first statement given by him was voluntarily given, at a time when he was not in custody, when the investigation was general and had not begun to focus upon him as a particular suspect, and that statement was admissible.

Turning to the statements made to Mr. Arnold and the confessions of guilt, the record discloses that the investigation had not focused on the appellants; and they were not

subject to a process of interrogation designed to elicit incriminating statements. Mr. Arnold came to the jail as a volunteer at a time when there were over a dozen people being held by the police as possible suspects or as witnesses to the assault and murder. The police then apparently knew that no more than three or four persons had been in the group which crossed the street and attacked Ake and Stubblefield. Thus, suspicion had not focused on these particular defendants. Mr. Arnold testified that he did not believe the defendants were involved and his discussion with the defendants was not based on the premise that the investigation had focused on them. He believed in their innocence until they made their voluntary statement to him that they had ''done it'' and explained the circumstances. When suspicion has not yet focused on a suspect, the investigatory stage has not become accusatory and statements made at that stage are not violative of the *Dorado* rule. (*People* v. *Danielson,* 233 Cal.App.2d 329 [43 Cal.Rptr. 644].) The record further shows that most of the questioning or talking was on the part of Arnold; that his conversation was based on the premise that the defendants were not involved; that what he said was designed to get the appellants to reveal the names of the parties who were actually involved so they would be released and David would be free to work at Arnold's service station the next day. Therefore, Arnold urged both defendants to tell the truth and the facts or details of the case were not discussed until after the voluntary confession was made. Since the questions were not a process of interrogation by officials and since they were not designed to seek self-incriminating statements, the confessions were not within the *Dorado* rule and were admissible. (*People* v. *Jones, supra,* 232 Cal.App.2d 379; *People* v. *Campbell,* 232 Cal.App.2d 712 [23 Cal.Rptr. 71].)

As the People point out, John Arnold may not be considered to be the agent of the police. He was an independent party; his purpose was not to help the police but to clear the appellants so they could be freed quickly. Thus, Arnold was a good friend of the defendants who was there to help them for his own reasons and not to help the police.

In a case involving a confession made by the defendant to a television reporter, the court held in *People* v. *Price,* 63 Cal.2d 370, at page 379 [46 Cal.Rptr. 775, 406 P.2d 55]: ''In *Massiah* [*Massiah* v. *United States,* 377 U.S. 201 (84 S.Ct. 1199, 12 L.Ed.2d 246)] the statements were excluded upon a showing that police had prevailed upon the defend-

ant's partner in crime to engage defendant in a discussion of the accusations while they sat in an automobile containing a radio device which transmitted the conversation to police officers nearby. The record in the case before us does not permit a conclusion that the private reporter was acting in any respect on behalf of or as an agent for the prosecution. In this regard we attach no special significance to the fact urged by defendant that the reporter had obtained permission for the interview from the officer exercising custody. Absent evidence of police complicity, the admission of defendant's statement to the reporter infringed no constitutional right nor defeated any purpose fostered by the recent decisions of the United States Supreme Court and of this court.''

In our opinion, the defendants' confessions initially made to Arnold and subsequently, without solicitation, repeated to Officer Kelley in the presence of Arnold, were properly received in evidence. ■ As was said in *People* v. *Dorado, supra,* 62 Cal.2d 338, at page 354: ''. . . any statements obtained without coercion, including, of course, the unsolicited, spontaneous confession, given in the absence of the requirements for the accusatory stage, may be admitted into evidence.'' ■ Even if we assume that receipt in evidence of the last formal confessions which followed the spontaneous confessions to Arnold and to Arnold and Kelley and were repetitions thereof was error, reversal is not compelled for it is manifest that such error ''. . . did not produce a miscarriage of justice which would make a different result probable on retrial.'' *People* v. *Ford,* 234 Cal.App.2d 480, 495 [44 Cal.Rptr. 556] ; see also *People* v. *Jacobson,* 63 Cal.2d 319 [46 Cal.Rptr. 515, 405 P.2d 555], and *People* v. *Cotter,* 63 Cal.2d 386 [46 Cal.Rptr. 622, 405 P.2d 862].)

Since the full confessions made by the defendants after their private discussion in the Spanish language and their conversation with Arnold are admissible, then admission of the reported confessions made on the morning of March 7, 1964, are at the most nonprejudicial. They were mere repetitions of the earlier good confessions, with details filled in. In *People* v. *Jacobson, supra,* 63 Cal.2d 319, there was testimony as to multiple voluntary confessions of guilt uttered by the defendant, followed by two tape-recorded confessions obtained in violation of the rights of the defendant. At page 330-331 of the opinion, the court said: ''No undue emphasis was placed on any of the confessions at the guilt phase. Each

person who had witnessed defendant make an incriminating statement testified to what he had heard. No one confession contained details significantly different from the others. The two properly [improperly?] obtained statements were therefore merely cumulative. Moreover, the sequence of the confessions here, where the improper statements were the last obtained, can give rise to no implication that the legally obtained confessions were 'induced' by those subsequently improperly obtained." Judgment of conviction was affirmed.

Appellants next contend that the confessions made by the defendants were involuntary as a matter of law. The argument is predicated upon statements made by Arnold and Kelley to the defendants. The court is told that a mere glance at the transcript will confirm the importance of promises made. The transcript embraces 823 pages. The so-called promises pointed to are these: Arnold told the defendants that things would go easier on them if they would tell the truth, and Officer Kelley made no attempt to inform the boys to the contrary; that Arnold told the defendants that Kelley was fair; that David asked if Kelley could be trusted and Arnold replied that he could; Kelley testified that when David asked him how much time he would get if he were responsible for the crime, "I said I felt in my heart that he would do some time in jail if he was responsible for this crime." Counsel for appellants interprets these various statements as promises of leniency, as implications that if David confessed he would not have to worry about the death penalty, life imprisonment or even a lengthy term in prison, and as inducements for the confessions upon which the defendants relied.

The record discloses that a lengthy *voir dire* examination, embracing some 290 pages of the transcript, was conducted by the trial judge on the issue of whether or not the confessions were coerced. The trial judge ruled that no promises or threats were made to the defendants which operated as an inducement to the confessions. In *People* v. *Dolan,* 38 Cal. App.2d 96, 98 [100 P.2d 791], the applicable general principle is stated thusly: "There was thus a conflict of evidence as to whether the confessions had been freely and voluntarily made, the determination of which question lay in the sound discretion of the trial judge; and, being supported by substantial evidence, his finding that the confessions were not obtained by force or coercion is binding upon this court."

(See also *People* v. *Freeland,* 218 Cal.App.2d 199 [32 Cal. Rptr. 132]; *People* v. *Montano,* 184 Cal.App.2d 199 [7 Cal.Rptr. 307].) The trial court opined that ''When inquiry was made as to the possible degrees of murder, a truthful reply was made to such inquiry. At the conclusion of both confessions taken down by a reporter, each defendant declared his confession to be free and voluntary and the Court believes it so to be.''

Appellants rely upon testimony of Mr. Arnold that, in the presence of David, or both David and Frank, Kelley told a story about another case in which the defendants were dealt with more leniently because they confessed to the crime. Kelley testified that there was some discussion concerning the other case but that it occurred between himself and Mr. Arnold before they met with the defendants, or either of them. The court resolved the conflict in favor of the People, as it had a right to do. As has been mentioned, Arnold was a reluctant witness. In ruling on the voluntariness of the confessions, the trial judge said, in part: ''I think that there are admittedly contradictions in the statements of Mr. Kelley and Mr. Arnold. Mr. Arnold I would have to say was a rather hostile witness against the prosecution, having a great interest in these boys. But I cannot say he was wholly unbiased but, of course, I think he was endeavoring to tell the truth, as Officer Kelley was.''

In speaking further of Arnold's testimony, the court said: ''Yes, I disbelieved him in the statement that these were promises made to induce; that they were anything other than factual statements. In other words, the statement as to what the possible penalties could be was certainly not promises or inducements. Exhortations to tell the truth are not like an inducement and I think that is as far as the Court believes the statements went.''

This court may not reweigh the evidence and reject the trial court's finding on credibility. (*People* v. *Crooker,* 47 Cal.2d 348 [303 P.2d 753].)

Defendants next contend that the court erred in admitting, over objection, testimony of Gerald Tony Aganza and Henry Felix Rodriguez, pertaining to extrajudicial declarations of alleged coconspirators. In support of the contention, defendants make the bald statement that the fact of conspiracy cannot be proved by evidence of extrajudicial declarations of an alleged coconspirator, but only after and upon proof of

the conspiracy itself can such declarations be admitted. (*Davis* v. *Superior Court*, 175 Cal.App.2d 8 [345 P.2d 513].) The claimed extrajudicial declarations to which complaint is made are not set out; no evidence is pointed to; no transcript references are given; no argument is made; and at oral argument defendants waived this point.

Appellants next coalesce a contention that the court erred in permitting in evidence the testimony of Shirley Boyd and Jo Ann Baronian, pertaining to acts and declarations they observed where there was no evidence that the appellants were involved in those events and a contention that the judgments on all three counts must be reversed on the grounds of insufficiency of the evidence. A general short argument is made without transcript references and without any citation of authority, but raising numerous problems. Appellants, in effect, merely invite this court to read the transcript to ascertain the nature of the testimony given, analyze it in the light of all other evidence then before the court, ascertain the nature of the objection made, if one was made, and consider the propriety of the court's rulings in each instance. Defendants also waived this point at oral argument.

The courts have consistently refused to accept an invitation on the part of an appellant's counsel to review an entire record for the purpose of overturning a judgment. In *People* v. *Goodall*, 104 Cal.App.2d 242, at page 249 [231 P.2d 119], the court made the statement, quoted with approval in the subsequent cases of *People* v. *Justice*, 167 Cal.App.2d 616, 618 [334 P.2d 1031], and *People* v. *Klimek*, 172 Cal.App.2d 36, 44 [341 P.2d 722], that: ''It is the duty of the defendants to show error, and that means defendants are under an affirmative duty in that respect. It is not proper to attempt to shift that burden upon the court or respondent.''

In *People* v. *Williams*, a murder case, 174 Cal.App.2d 364, at page 391 [345 P.2d 47], it is said: ''The burden rests upon an appellant to show not only error, but that such error operated to prejudice his substantial rights, militated against his receiving a fair trial, and resulted in a miscarriage of justice. . . .'' And in *People* v. *Jones*, another murder case, 215 Cal.App.2d 341, at page 343 [30 Cal.Rptr. 280], the court stated:

''In support of his first point counsel makes no attempt to comply with the cardinal rule of appellate practice that all of the evidence, both favorable and unfavorable, must be pre-

sented in appellant's brief so that the court may determine whether there is any substantial evidence to support the finding of guilt [citation]. The rule extends to criminal as well as civil cases. . . .''

██ The evidence to sustain the appellants' convictions on all three counts is more than sufficient. The proof of the conspiracy alleged in the information to disturb the peace was proved beyond any question by extensive testimony. Overt acts in furtherance of this conspiracy were also fully proved, including the gathering at the Mendez house, the arming of various persons involved, including appellants, the trip to the auditorium to engage in a fight, and the standing on the lawn chanting for the opponents to come out and fight.

The specific aim of the conspiracy had changed from the desire to fight the Park Side group to fighting anyone. There was more than sufficient evidence that the majority of the group intended to fight the Park Side gang, including the appellants, and then decided to fight anybody else available, and they moved to the parking lot across from the auditorium in pursuit of this objective. One of the parties beat on the roof of a car, and when the two couples appeared across the street, someone said, ''Let's go get them,'' and then the group went across the street, obviously acting in furtherance of the original conspiracy to disturb the peace, even though the precise manner of doing so had slightly changed.

Under such a showing there can be no reasonable question regarding the fact that the attack on Ake and Stubblefield was in pursuit of the objectives of the conspiracy to disturb the peace, and each person so doing is liable for the acts of the others in the conspiracy. (See *People* v. *Harper*, 25 Cal.2d 862, 876 [156 P.2d 249].) ██ Thus, David Martinez is responsible for the murder of Ake by his brother Frank, and Frank Martinez is responsible for the attack on Stubblefield by David.

The question raised by appellant David Martinez as to whether or not Frank Martinez was acting outside the scope of the original conspiracy is untenable. ██ It is well settled that: ''. . . if in the consummation of an express and unlawful purpose of the conspiracy, one of the conspirators goes outsìde of such express purpose and kills, the other conspirators cannot escape responsibility where, as here, such killing is not an unreasonable result to be expected from the

acts . . . which were contemplated." *(People* v. *Cowan,* 38 Cal.App.2d 231, 239 [101 P.2d 125].)

We agree with the Attorney General's contention that whether or not David Martinez was responsible for his brother Frank's acts as a member of the conspiracy, he is liable as one who aided and abetted his brother, under Penal Code section 31.

The decision of the trier of fact on this issue is final when it is supported by sufficient evidence in the record. *(People* v. *Pedesclaux,* 216 Cal.App.2d 1 [30 Cal.Rptr. 574].)

The record clearly supports the inference that appellant David Martinez knowingly aided and abetted Frank Martinez in the perpetration of the assault on the two men, and this is sufficient to support the conviction of David for the acts of Frank. *(People* v. *Demes,* 220 Cal.App.2d 423 [33 Cal.Rptr. 986].) An aider and abettor is guilty of the natural and reasonable or probable consequences of the acts he knowingly aided or encouraged. *(People* v. *Goldstein,* 146 Cal.App.2d 268 [303 P.2d 892].)

The evidence is sufficient to sustain a conviction of first degree murder as to appellant Frank Martinez. This issue is decided by the trier of facts and where there is sufficient evidence, the conviction must be sustained. In *People* v. *Cole,* 47 Cal.2d 99, at page 106 [301 P.2d 854, 56 A.L.R.2d 1435], it is said: "Deliberation and premeditation may be inferred from proof of circumstances which will furnish a reasonable foundation for such an inference, and, where the evidence is not in law insufficient, the matter is exclusively within the province of the jury for determination. *(People* v. *Gulbrandsen,* 35 Cal.2d 514, 519-520 [218 P.2d 977].)"

Several other suggestions of error, unsupported by argument or authority, were made by defendants in their opening brief, and abandoned by their counsel at oral argument. Therefore, we deem it unnecessary to consider or determine these points.

We note that in *People* v. *McFarland,* 58 Cal.2d 748, at pages 762-763 [26 Cal.Rptr. 473, 376 P.2d 449], the court discusses double punishment and states: "With respect to the procedure to be followed on appeal where double punishment has been erroneously imposed, it should be stressed that section 654 [of the Penal Code] proscribes double punishment, not double conviction; conduct giving rise to more

than one offense within the meaning of the statute may result in initial conviction of both crimes, only one of which, the more serious offense, may be punished. (*People* v. *Chessman,* 52 Cal.2d 467, 497 [341 P.2d 679].) The appropriate procedure, therefore, is to eliminate the effect of the judgment as to the lesser offense insofar as the penalty alone is concerned.''

Appellant Frank Martinez was adjudged guilty of first degree murder, assault, and conspiracy, the sentences for which were to run concurrently. Appellant David Martinez was adjudged guilty of second degree murder, assault, and conspiracy, the sentences likewise to run concurrently.

Of the three offenses involved herein concerning Frank Martinez, first degree murder is the one subject to the greatest punishment, and as to David Martinez, second degree is the one subject to the greatest punishment, and accordingly, as stated in *People* v. *McFarland, supra,* 58 Cal.2d 748; *Neal* v. *State of California,* 55 Cal.2d 11, 21 [9 Cal.Rptr. 607, 357 P.2d 839]; *People* v. *Houston,* 219 Cal.App.2d 187 [33 Cal. Rptr. 26]; and *People* v. *Jones,* 211 Cal.App.2d 63 [27 Cal.Rptr. 429], it is necessary to eliminate the effect of the judgment as to each appellant as it relates to punishment for assault and conspiracy.

The judgment is therefore reversed insofar as the sentences for assault and for conspiracy as to each appellant are concerned; in all other respects as far as the murder judgments are concerned, the judgments are affirmed.

Conley, P. J., and Stone, J., concurred.

A petition for a rehearing was denied January 31, 1966.